Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Charles (291237)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com
daniellec@hbsslaw.com

*Attorneys for Plaintiffs*
*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE MACDONALD, Individually and on Behalf of All Others Similarly Situated,<br><br>                                        Plaintiff,<br><br>        v.<br><br>DYNAMIC LEDGER SOLUTIONS, INC., a Delaware corporation, TEZOS STIFTUNG, a Swiss Foundation, KATHLEEN BREITMAN, an Individual, ARTHUR BREITMAN, an Individual, TIMOTHY COOK DRAPER, an individual, DRAPER ASSOCIATES, JOHANN GEVERS, DIEGO PONZ, GUIDO SCHMITZ-KRUMMACHER, BITCOIN SUISSE AG, NIKLAS NIKOLAJSEN and DOES 1-100, INCLUSIVE,<br><br>                                        Defendants. | Case No. 3:17-cv-07095-RS<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................................1

II.    FACTS .......................................................................................................................4

III.   ARGUMENT .............................................................................................................6

       A.    Injunctive Relief Is Available and Appropriate for the Claims Asserted..................6

       B.    Plaintiff Must Show (1) A Likelihood of Success on the Merits; (2) A Likelihood of
             Irreparable Harm; (3) The Balance of Equities Tips in His Favor; and (4) An
             Injunction Is In the Public Interest .........................................................................8

       C.    Plaintiff and the Class Are Likely To Prevail On The Merits ...................................9

             a.    The Tezos ICO Was Governed By Federal and California Law and the Court
                   Has Personal Jurisdiction over the Defendants .................................................9

             b.    The Tezos ICO Was an Offer and Sale of Securities ....................................10

             c.    The California Securities Act and the UCL Forbid Selling or Participating In
                   the Sale of Unregistered Securities..............................................................13

       D.    Plaintiff and the Class Will Suffer Irreparable Harm in the Absence of Preliminary
             Relief .................................................................................................................15

       E.    The Balance of Equities Weighs In Favor Of Plaintiff and the Class ......................18

       F.    A Temporary Restraining Order is in The Public Interest ......................................19

IV.    CONCLUSION ........................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) ................................................................................................. 8

*American LegalNet, Inc. v. Davis,*
  673 F.Supp.2d 1063 (C.D. Cal. 2009) ................................................................................. 6

*Chanel, Inc. v. Partnerships or Unincorporated Associations Identified on Schedule "A",*
  No. C-13-02645 RS, 2013 WL 12120213 (N.D. Cal. June 14, 2013) ................................. 7

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
  321 F.3d 878 (9th Cir. 2003) ............................................................................................. 14

*Cotter v. Lyft, Inc.,*
  60 F. Supp. 3d 1067 (N.D. Cal. 2015) ............................................................................... 12

*Davis v. Metro Productions, Inc.,*
  885 F.2d 515 (9th Cir. 1989) ............................................................................................... 9

*Deckert v. Independence Shares Corp.,*
  311 U.S. 282 (1940) ............................................................................................................ 6

*Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,*
  890 F.2d 165 (9th Cir. 1989) ............................................................................................... 7

*Fidelity Nat. Title Ins. Co. v. Castle,*
  No. C 11-00896 SI, 2011 WL 5882878 (N.D. Cal. Nov. 23, 2011) .................................. 18

*Greater Houston Transp. Co. v. Uber Techs., Inc.,*
  No. CIV.A. 4:14-0941, 2015 WL 1034254 (S.D. Tex. Mar. 10, 2015) ............................ 12

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ............................................................................................................ 6

*Gwin v. Pac. Coast Fin. Servs.,*
  No. 09CV2734 BTM (BLM), 2010 WL 2609359 (S.D. Cal. June 28, 2010) ..................... 8

*Hall v. Superior Court,*
  150 Cal.App.3d 411 (1983) ................................................................................................. 8

*Hamelin v. Allstate Insurance Co.,*
  No. 01-cv-7954, 2002 WL 441581 (C.D. Cal. Mar. 12, 2002) ........................................... 7

*Hernandez v. Sessions,*
  872 F.3d 976 (9th Cir. 2017) ............................................................................................. 17

*In re CINAR Corp. Sec. Litig.,*
  186 F Supp 2d 279 (E.D.N.Y. 2002) ................................................................................... 9

*In re Focus Media Inc.,*
  387 F.3d 1077 (9th Cir. 2004) ............................................................................................. 6

*In re Heritage Village Church and Missionary Fellowship, Inc.*,
   137 B.R. 888 (Bankr. D.S.C. 1991)........................................................................ 12

*In re LDK Solar Sec. Litig.*,
   No. C0705182WHA, 2008 WL 4369987 (N.D. Cal. Sept. 24, 2008)........................... 9

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F Supp 2d 334 (D. Md. 2004).......................................................................... 9

*In re SFPP Right-of-Way Claims*,
   No. CV 15-7492, 2016 WL 6138423 (C.D. Cal. Jan. 21, 2016) ................................ 8

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) .............................................................................. 18

*Kokka & Backus, PC v. Bloch*,
   No. C 10-0110-RS, 2010 WL 331336 (N.D. Cal. Jan. 20, 2010) ............................. 6

*Kremen v. Cohen*,
   No. 5:11-cv-05411-LHK, 2011 WL 6113198 (N.D. Cal. Dec. 7, 2011) ..................... 18

*Moran v. Prime Healthcare Management Inc.*,
   3 Cal.App.5th 1131 (2016) .................................................................................. 13

*Moreland v. Dep't of Corps.*,
   194 Cal. App. 3d 506 (1987) ................................................................................ 11

*Moss v. Kroner*,
   197 Cal.App.4th 860 (2011) ................................................................................ 13

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
   151 Cal.App.4th 688 (2007) ................................................................................ 14

*Pashaian v. Eccelston Properties, Ltd.*,
   88 F.3d 77 (2d Cir. 1996) .................................................................................... 14

*People v. Black*,
   8 Cal.App.5th 889 (2017) .................................................................................... 10

*Providence Health & Servs. v. McLaughlin*,
   No. C17-24 RAJ, 2017 WL 68426 (W.D. Wash. Jan. 6, 2017) ................................ 8

*Romero-Barcelo*,
   456 U.S. 305 (1982) ........................................................................................... 18

*Rose v. Bank of America, N.A.*,
   57 Cal.4th 390 (2013) ......................................................................................... 14

*Roskind v. Morgan Stanley Dean Witter & Co.*,
   80 Cal.App.4th 345 (2000) .................................................................................. 14

*SEC v. Bar Works Capital, LLC*,
   No. 17-CV-04396, 2017 WL 4642311 (N.D. Cal. Oct. 16, 2017) ............................ 17

*SEC v. Bivona*,
  16-CV-01386-EMC, 2016 WL 2996903 (N.D. Cal. May 25, 2016) ............................................. 6

*SEC v. Glenn W. Turner Enters., Inc.*,
  474 F.2d 476 (9th Cir. 1973) ..................................................................................................... 12

*SEC v. Milan Capital Group, Inc.*,
  No. OO CIV. 108(DKC), 2000 WL 520653 (S.D.N.Y. Apr. 28, 2000) ..................................... 14

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980). ..................................................................................................... 13

*SEC v. Shavers*,
  4:13-CV-416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ....................................................... 10

*SEC v. Traffic Monsoon, LLC*,
  245 F.Supp.3d 1275 (D. Utah 2017) ............................................................................................ 8

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ..................................................................................................................... 9

*Silver Hills Country Club v. Sobieski*,
  55 Cal.2d 811 (1961) ................................................................................................................... 10

*Stokes v. Henson*,
  217 Cal.App.3d 187 (1990) ........................................................................................................... 7

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ....................................................................................................... 7

*Transfirst Group, Inc. v. Magliarditi*,
  217CV00487APGVCF, 2017 WL 2294288 (D. Nev. May 25, 2017) ......................................... 14

*U.S. v. Faiella*,
  39 F.Supp.3d 544 (S.D.N.Y. 2014) ............................................................................................. 10

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017) ............................................................................................................. 1

*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ................................................................................................ 11, 12

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................................... 7, 17

**Statutes**

Cal. Bus. & Prof. Code § 17200 et seq. ...................................................................................... 1, 6

California Corporate Securities Act of 1968 .................................................................................... 2
  Cal. Corp. Code § 25110 ........................................................................................................ 1, 13
  Cal. Corp. Code § 25503 ............................................................................................................. 15

Securities Act of 1933 ................................................................................................ 13

**Other Authorities**

Michaels, Dave & Paul Vigna,
 *SEC Chief Fires Warning Shot Against Coin Offerings*, WALL STREET JOURNAL (Nov. 9, 2017). 10

Popper, Nathaniel,
 *Initial Coin Offerings Horrify A Former SEC Regulator*, N.Y. TIMES (Nov. 26, 2017)............. 2, 10

Sauter, Benjamin, David McGill, & Brian Klein,
 *Initial Coin Offerings: Where the SEC Might Stand*, COINDESK (June 16, 2017), available at
 https://www.coindesk.com/initial-coin-offering-ico-where-sec-might-stand/ ................................ 12

SEC Release No. 81207,
 *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The
 DAO* (July 25, 2017)................................................................................................ 10

**Rules**

Fed. R. Civ. P. 65(b)................................................................................................ 7

I.   **INTRODUCTION**

Plaintiff Bruce MacDonald, individually and on behalf of the Class, seeks a Temporary Restraining Order to stop Defendants from further misappropriating investor funds illegally raised through the unqualified and unregistered offer and sale of securities referred to as Tezos tokens (aka "XTZ", "Tezzies" or "tez"). As alleged in the Complaint, Defendants illegally sold unqualified securities in violation of California's Corporate Securities Law of 1968 (Cal. Corp. Code § 25110) and California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.). In doing so, Defendants collected approximately $232 million USD worth of cryptocurrencies from investors (primarily Bitcoin and Ethereum), now worth over $1.2 billion USD. At present, an ongoing combination of the conversion of ICO proceeds, accusations of self-dealing, a lack of transparency, a lack of regulatory oversight, a refusal to acknowledge investor concerns or claims, and unreported payments, bonuses, and fees all threaten the proceeds collected from the Class.

Two days ago—December 12, 2017—Reuters reported that Defendant Schmitz-Krummacher had resigned from the three-member board of Defendant Tezos Stiftung (the "Tezos Foundation" or the "Foundation"), the entity that currently holds the investor funds at issue. Schmitz-Krummacher's replacement will be handpicked by Defendant Johann Gevers, one of the other directors. Gevers has been accused by Defendants Arthur and Kathleen Breitman of "self-dealing, self-promotion, []conflicts of interest," and "enriching" himself through an unjustified seven-figure "bonus." By choosing a compliant director, Gevers can gain effective majority control of the Tezos Foundation's board—creating a significant risk to the assets that rightfully belong to Plaintiff and other class members. Without immediate judicial intervention, Defendants may completely consume the illegally obtained ICO proceeds, leaving Plaintiff and the Class with no remedy.

In July 2017, Defendants conducted an "Initial Coin Offering" or "ICO" to fund the development of Tezos (the "Tezos ICO")—a blockchain technology.[4] The ICO acronym is evocative

---

[4] Defendants have posited the Tezos project as somewhat similar to Bitcoin, which "allow[s] vendors and customers to maintain their anonymity in the same way that cash does, by transferring Bitcoins between anonymous Bitcoin accounts, which do not contain any identifying information about the user of each account. The currency is 'traceable' in that the transaction history of each individual Bitcoin is logged in what is called the blockchain. The blockchain prevents a person from

of "IPO" and deliberately so. Initial coin offerings—including the Tezos ICO—mimic the economics of a traditional initial public offering in almost every way: issuers raise funds from widely dispersed public investors who pay money with the expectation of earning a profit from the issuers' activities.

But the Tezos ICO made no attempt to comply with SEC regulations or state blue sky laws requiring the registration of public offerings. In the words of one former SEC Commissioner, "I.C.O.s represent the most pervasive, open and notorious violation" of the securities laws "since the Code of Hammurabi."[5] On December 11, 2017, the current SEC Chairman put out a formal statement addressing ICOs, noting "[i]t is **especially troubling** when"—as in the case of Tezos— "the promoters of these offerings emphasize the secondary market trading potential of these tokens. Prospective purchasers are being sold on the potential for tokens to increase in value—with the ability to lock in those increases by reselling the tokens on a secondary market—or to otherwise profit from the tokens based on the efforts of others.  **These are key hallmarks of a security and a securities offering.**"[6]

As with other ICOs, Defendants marketed the Tezos tokens sold in the ICO as an investment. And in the two-week Tezos ICO, Defendants raised significant sums of so-called cryptocurrency (primarily Bitcoin and Ethereum) valued, at the time, at approximately $232 million USD. Since the ICO, those cryptocurrencies have increased dramatically in value and the Tezos ICO Proceeds are now worth over $1 billion USD.

The issuance and sales of Tezos tokens in the ICO were securities transactions. By selling and/or participating in the sale of unregistered securities, Defendants violated the California

---

spending the same Bitcoin twice, allowing Bitcoin to operate similarly to a traditional form of currency. Bitcoin is also a completely decentralized currency, operating free of nation states or central banks; anyone who downloads the Bitcoin software becomes part of the Bitcoin network. The blockchain is stored on that network, and the blockchain automatically 'self-updates' when a Bitcoin transaction takes place." *United States v. Ulbricht*, 858 F.3d 71, 83 (2d Cir. 2017).

[5] Nathaniel Popper, *Initial Coin Offerings Horrify A Former SEC Regulator*, N.Y. TIMES (Nov. 26, 2017) (quoting former SEC Commissioner, Joseph Grundfest).

[6] Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017), available at: https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11

APPLICATION FOR TRO - 2
Case No.:

Corporate Securities Act of 1968 (hereafter, the "California Securities Act") and the Unfair

Competition Law (hereafter, "UCL"). Plaintiff and other investors in the ICO are entitled to

rescission, restitution, and/or disgorgement.

But those remedies may be illusory unless this Court grants preliminary relief. The

cryptocurrency that Plaintiff and putative Class members paid—and seek to have returned—is being

looted by the Defendants. Specifically, the cryptocurrency paid by Plaintiff and other investors is

currently held by the Tezos Foundation. Defendants Gevers, Ponz, and Schmitz-Krummacher are (or,

in Schmitz-Krummacher's case, were) the Foundation's directors. Some unknown combination of

the Defendants control the distribution of the Foundation's assets—including the cryptocurrency that

Plaintiff and other investors are entitled to have returned—through a complex "multisignature

procedure."[7]

On October 18, 2017, a lawyer for Tezos's founders, Defendants Arthur and Kathleen

Breitman, sent a 46-page letter accusing Defendant Gevers of "self-dealing, self-promotion, and

conflicts of interest." The Breitmans suggested further that Gevers was "enriching" himself through

an unjustified seven-figure "bonus." Gevers has fired back—accusing the Breitmans of "character

assassination," "misleading statements and outright lies" and accusing his fellow board members,

Ponz, and Schmitz-Krummacher of an "illegal coup." The Foundation appears to have fired its

auditors and has provided no explanation why.[8] Now Schmitz-Krummacher has resigned and his

replacement will be named by Gevers.

Plaintiff and the Class cannot afford to wait until trial to sort out who is cheating whom. And

they shouldn't have to. No matter who is telling the truth about the internal dispute, **all** of the

---

[7] On December 6, 2017, a Swiss journalist reported that one of the required signatories is
Defendant Bitcoin Suisse AG: "Bitcoin Suisse has broken its silence to reveal that it has the
responsibility of counter-signing every transaction that the foundation makes. In other words, the
foundation cannot spend a cent unless Bitcoin Suisse agrees."

[8] The Foundation has also been converting some of its cryptocurrency holdings to cash, committing
ICO proceeds to "venture capital partner[ships] to be announced," and distributing funds to
Defendant DLS, a Delaware corporation owned by Defendants Arthur Breitman, Kathleen Breitman,
Draper, and Draper Associates. The Breitmans have also sought to have the Foundation pay their
legal fees.

Defendants engaged in an illegal scheme to sell unregistered securities. As a result, Plaintiff and the Class are entitled to rescission and restitution of the cryptocurrency that they paid in the ICO. The Court should enter an injunction freezing the ICO Proceeds and enjoining Defendants from further transfers to ensure that restitution and rescission are meaningful remedies.

## II.    FACTS

The Tezos project was the brainchild of Defendants Arthur and Kathleen Breitman, a husband and wife team, who were, at all relevant times, citizens of California. ¶16. In August and September 2014, Arthur Breitman, under the pseudonym "L.M. Goodman," released a Position Paper and White Paper, touting Tezos as a "self-amending crypto-ledger." ¶44. Arthur Breitman also authored a "Tezos Business Plan" in early 2015, in which he listed himself as chief executive of Tezos. ¶45.

In August 2015, Arthur Breitman created and incorporated Dynamic Ledger Solutions Inc. ("DLS") in Delaware to develop Tezos, listing himself as chief executive. ¶46. DLS has been principally operated out of the home of Arthur and Kathleen Breitman in Mountain View, California, and continues to be owned and controlled by Arthur Breitman, Kathleen Breitman, Timothy Draper, and Draper Associates. ¶46. In a pre-sale, ten early backers, including hedge funds and high net-worth individuals, provided the Breitmans with $612,000 in exchange for XTZ tokens equivalent to $893,200.77 in contributions (corresponding to a 31.48% discount). ¶47.

Around May 2017, the Tezos project started running out of cash, and Defendant Kathleen Breitman reached out to Defendant Timothy Draper, who invested $1.5 million into Tezos through his firm, Draper Associates. ¶48. As a result of the investment, Draper Associates also took a minority stake in DLS, which controls the Tezos source code and other intellectual property. ¶48.

On or about April 24, 2017, the Foundation was formed as a Swiss nonprofit (Stiftungen) in Zug, Switzerland, purportedly to promote the development and use of the Tezos blockchain, and to be the recipient of ICO funds. ¶49. Defendants Gevers, Ponz, and Schmitz-Krummacher were named as the Foundation's directors. ¶22. A contract between DLS and the Foundation was signed in June 2017. ¶52. The agreement, which is not public, governs the sale of DLS and its intellectual property

to the Foundation and states that the Swiss federal supervisory authority for foundations must approve the agreement. ¶52. It also indicates that approval was required before the fundraiser took place. ¶52. This approval has never taken place, and documents provided to participants in the fundraiser did not mention the required approval by the Swiss authority. ¶52. The façade of the Tezos Foundation being a completely separate and distinct entity is further weakened by the fact that DLS and the Breitmans have now turned to the Tezos Foundation's funds (*i.e.*, the ICO proceeds) in an attempt to pay their legal fees incurred in connection with defending the illegal offering. ¶52.

On May 5, 2017, less than two months before the start of the Tezos ICO, Defendant Timothy Draper promoted the Tezos ICO by announcing his investment in Tezos. ¶53. He became, according to Reuters, the "first prominent venture capitalist to openly embrace initial coin offerings." ¶53. Draper promoted the ICO, stating that "The best thing I can do is lead by example," implying that he was standing in the same position as any other ICO participant. ¶54. "Over time, I actually feel that some of these tokens are going to improve the world, and I want to make sure those tokens get promoted as well. I think Tezos is one of those tokens." ¶54. A July 7, 2017 story in the Wall Street Journal noted that Tezos was "helped by having one prominent backer: Tim Draper, a founder of the Silicon Valley venture-capital firm Draper Fisher Jurvetson. Mr. Draper's small undisclosed personal investment in the firm, and his public pledge to buy into the initial coin offering, significantly raised Tezos's profile." ¶54.

The Tezos ICO began on July 1, 2017 and lasted about two weeks. ¶63. The Tezos ICO was "uncapped" which meant that there was no limit on the amount of payments that were accepted. ¶63. Defendants attempted to characterize the payments made by Plaintiff and other investors as "contributions" but as their own statements and promotional materials make clear, the Tezos tokens were marketed as an investment. ¶¶64, 65.

Ultimately, the Tezos ICO collected 65,627 Bitcoin and 361,122 Ethereum, including 18.145 Ethereum from Plaintiff, a California resident. ¶¶5, 20. At the time of the Tezos ICO, the combined value of those cryptocurrencies was approximately $232 million USD. ¶5. Today, they would be worth over $1 billion USD. ¶5.

APPLICATION FOR TRO - 5
Case No.:

In an August 2017 update, the Foundation stated that it had "been slowly converting these assets [*i.e.*, the cryptocurrency paid by Plaintiff and other investors] into cash at a pace of roughly CHF 500,000 per day." ¶107. On August 10, 2017, the Foundation announced that it had committed $50 million USD in ICO proceeds "through venture capital partners to be announced" and was creating "a direct venture arm" for "companies looking to build on the Tezos platform." ¶110. The Foundation has also given funds to DLS. ¶111.

On or around October 18, 2017, an attorney for the Breitmans sent a 46-page letter to Defendants Ponz, and Schmitz-Krummacher, calling for Gevers' prompt removal from the Foundation's board. ¶103. The document accuses Gevers of "self-dealing, self-promotion and conflicts of interest." ¶103. According to the Breitmans, Gevers has been improperly enriching himself through an unjustified seven-figure "bonus." ¶102.  Gevers responded by accusing the Breitmans of "character assassination," "misleading statements and outright lies" and accusing Ponz and Schmitz-Krummacher of an "illegal coup." ¶104.  The Tezos Foundation promised that an audit of the ICO Proceeds would be published in November 2017. ¶ 112. But no report has been forthcoming and a document filed with the Swiss Commercial Register indicates that the Foundation has terminated the auditing firm Lufida Revision AG. ¶112.

On December 12, 2017, Reuters reported that Schmitz-Krummacher resigned from his position as a director  and that "[u]nder the foundation's bylaws, Gevers gets to nominate Schmitz-Krummacher's replacement. If the third board member votes against the candidate, Gevers can cast an overriding vote." ¶28.

## III.   ARGUMENT

### A.  Injunctive Relief Is Available and Appropriate for the Claims Asserted.

Section 17203 of California's Unfair Competition Law explicitly authorizes the Court to provide for injunctive relief in instances such as the present action. It states:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. **The court may make such orders or judgments, including the appointment of a receiver,** as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or **as**

APPLICATION FOR TRO - 6
Case No.:

**may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition**.[9]

The Supreme Court has limited the availability of pre-judgment injunctions imposing asset freezes for claims seeking money damages. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999). But where, as here, a complaint seeks equitable relief, it is—and remains—well-established that a district court has authority to issue injunctive relief "to preserve the status quo pending final determination," particularly where, as here, there is reason to believe that the assets in question are "in danger of dissipation or depletion." *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940); *In re Focus Media Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004) ("when equitable claims are at issue … the rule barring issuance of a preliminary injunction freezing assets is inapplicable").[10]

This Court has recognized that "a court may issue preliminary relief to preserve the status quo as to property, where the plaintiff is claiming some sort of equitable right in it." *Kokka & Backus, PC v. Bloch*, No. C 10-0110-RS, 2010 WL 331336, at *2 (N.D. Cal. Jan. 20, 2010) (Seeborg, J.); *see also SEC v. Bivona*, 2016 WL 2996903, at *2 (N.D. Cal. May 25, 2016) ("The preliminary injunction will preserve the assets, preventing the 'irreparable harm' of those assets being dissipated.").

Here, Plaintiff and the Class assert claims under the California Securities Law and the UCL. Both statutes provide for equitable remedies: rescission[11] or restitution.[12] As such, injunctive relief preserving the Tezos Foundation's assets is legally authorized and appropriate.

---

[9] Cal. Bus & Prof. Code § 17203 (emphasis added).

[10] "Expedited discovery is … appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings," and Plaintiff will be filing a motion seeking such discovery shortly. *American LegalNet, Inc. v. Davis*, 673 F.Supp.2d 1063, 1066 (C.D. Cal. 2009).

[11] "For violation of section 25110, rescission damages are allowed under section 25503." *Stokes v. Henson*, 217 Cal.App.3d 187, 193 (1990); *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165, 170 (9th Cir. 1989) ("Rescission is an equitable remedy …").

[12] *See Hamelin v. Allstate Insurance Co.*, No. 01-cv-7954, 2002 WL 441581, at *2 (C.D. Cal. Mar. 12, 2002) ("Only equitable relief is available under UCL; money damages are not available. However, restitution and disgorgement, which traditionally are equitable remedies, are also available

**B. Plaintiff Must Show (1) A Likelihood of Success on the Merits; (2) A Likelihood of Irreparable Harm; (3) The Balance of Equities Tips in His Favor; and (4) An Injunction Is In the Public Interest**

A temporary restraining order ("TRO") may be granted on an *ex parte* basis where "specific facts in … a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and … the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. Proc. 65(b).

"In federal practice, a verified complaint . . . functions as an affidavit" and can serve as evidence supporting a TRO. *In re SFPP Right-of-Way Claims*, No. CV 15-7492, 2016 WL 6138423, at *5 (C.D. Cal. Jan. 21, 2016) (internal citations and quotations omitted); *Providence Health & Servs. v. McLaughlin*, No. C17-24 RAJ, 2017 WL 68426, at *2 (W.D. Wash. Jan. 6, 2017) ("Having considered Plaintiff's verified complaint, motions, supporting certificate, and governing law, the Court finds that the TRO without notice is appropriate in this case."); "*Gwin v. Pac. Coast Fin. Servs.*, No. 09CV2734 BTM (BLM), 2010 WL 2609359, at *1 (S.D. Cal. June 28, 2010) ("Although Defendants argue that they have not produced any evidence supporting it, the Court can consider as evidence Plaintiffs' First Amended Complaint because it is verified.").

The standard for obtaining a TRO is the same as the standard for obtaining a preliminary injunction. *Chanel, Inc. v. Partnerships or Unincorporated Associations Identified on Schedule "A"*, No. C-13-02645 RS, 2013 WL 12120213, at *1 (N.D. Cal. June 14, 2013). A plaintiff must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Plaintiff here satisfies all four *Winter* factors.

---

under UCL.")

APPLICATION FOR TRO - 8
Case No.:

### C. Plaintiff and the Class Are Likely To Prevail On The Merits

Plaintiff and the Class assert two counts targeting the same misconduct: the sale of unregistered securities. There will be no dispute that the Tezos tokens were unregistered and widely offered to the public. ¶¶3, 55, 126. The core merits question, at the heart of both counts will be whether the Tezos ICO constituted the offer and sale of "securities." Plaintiff and the Class have a strong likelihood of prevailing.

#### a. The Tezos ICO Was Governed By Federal and California Law and the Court Has Personal Jurisdiction over the Defendants

As a threshold question, there is little dispute that California (and federal) law applied to the Tezos ICO. Where non-exchange-listed securities are offered and sold over the Internet, the offer takes place in the location of the seller (here, California) and the sale takes place in both the location of the seller and the location of the buyer (here, also California). *See Securities and Exchange Commission v. Traffic Monsoon, LLC*, 245 F.Supp.3d 1275, 1296 (D. Utah 2017) ("Section 17(a), therefore, applies to AdPacks sold to individuals outside the United States for two reasons. As noted above, the sale occurs both in the United States and in the foreign country of the purchaser. In addition, Traffic Monsoon's offer to sell AdPacks over the internet occurred in the United States where Traffic Monsoon, LLC is located."); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) ("[T]o adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security."); *Hall v. Superior Court*, 150 Cal.App.3d 411, 418 (1983) ("the right of a buyer of securities in California to have California law and its concomitant nuances apply to any future dispute arising out of the transaction is a provision … which cannot be waived or evaded by stipulation of the parties to a securities transaction.") (internal quotations omitted).

The Court also has personal jurisdiction over all of the Defendants. The Breitmans, DLS, Draper, and Draper Associates are all California citizens. ¶16. The remaining defendants are Swiss

APPLICATION FOR TRO - 9
Case No.:

(or, at least, resident in Switzerland). ¶¶22, 26, 27, 28, 29, 30. But by purposefully targeting investors in California and the United States, the Swiss defendants made themselves subject to the personal jurisdiction of this Court. In the context of traditional initial public offerings ("IPOs"), courts have not hesitated to find jurisdiction over foreign defendants who participated in an IPO. *See, e.g.*, *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 523 (9th Cir. 1989) (Due Process clause permitted exercise of personal jurisdiction over officers and directors of issuer who had "fair warning" that they could be haled into district court in Arizona where statute created "personal[] liab[ility] for securities violations" and defendants knew that issuer was soliciting investors in Arizona); *In re LDK Solar Sec. Litig.*, No. C0705182WHA, 2008 WL 4369987, at *6 (N.D. Cal. Sept. 24, 2008) ("Plaintiffs base their jurisdictional claim predominantly on defendants' role in their company's 2007 initial public offering. In mid–2007, LDK sold shares on the New York Stock Exchange in order to raise badly needed funding. Defendants signed the prospectus for the offering and caused it to be filed with the SEC. … Plaintiffs have satisfied their burden of establishing personal jurisdiction based on these well-pled allegations, subject to proof at trial."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F Supp 2d 334, 351–52 (D. Md. 2004) ("courts frequently have asserted personal jurisdiction over individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors.") (collecting cases); *In re CINAR Corp. Sec. Litig.*, 186 F Supp 2d 279, 305–06 (E.D.N.Y. 2002) ("The Court finds that it is perfectly reasonable to exercise jurisdiction over Corbeil based solely on her signing the 1999 Registration Statement."). The same result should hold true for the Tezos ICO.

### b.  The Tezos ICO Was an Offer and Sale of Securities

A transaction or investment vehicle is a security under federal law if "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). A transaction is a security under California law if it satisfies either the *Howey* test or the slightly-more flexible "risk capital" test of *Silver Hills*

*Country Club v. Sobieski*, 55 Cal.2d 811 (1961).[13] *See People v. Black*, 8 Cal.App.5th 889, 900 (2017) ("[B]oth the risk capital and federal tests may be applied, either separately or together; a transaction is a security if it satisfies either test.").

The tokens sold in the Tezos ICO qualify under either test. The current Chairman of the SEC says he has "yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."[14] A former SEC Commissioner says that "I.C.O.s represent the most pervasive, open and notorious violation of federal securities laws since the Code of Hammurabi."[15] The SEC has issued an extensive Investigative Report concluding that a similar ICO constituted the sale of unregistered securities. *See* SEC Release No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO* (July 25, 2017).

### i.   Plaintiff and other Class members invested money in a common enterprise

The Bitcoin and Ethereum raised by Defendants from Plaintiff and other class members are money/funds. *See U.S. v. Faiella*, 39 F.Supp.3d 544, 545 (S.D.N.Y. 2014) (Rakoff, J.) ("Bitcoin clearly qualifies as 'money' or 'funds' under these plain meaning definitions. Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."); *SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is clear that Bitcoin can be used as money. It can be used to purchase goods or services.... [I]t can also be exchanged for conventional currencies...."). The money that they invested was pooled together with the stated goal of funding further development of Tezos' blockchain technology. ¶¶83, 89.

---

[13] The risk-capital test deems an investment to be a security if it "involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money." *Silver Hills* (1961) 55 Cal.2d 811, 815.

[14] *See* Dave Michaels and Paul Vigna, *SEC Chief Fires Warning Shot Against Coin Offerings*, WALL STREET JOURNAL (Nov. 9, 2017) (quoting SEC Chairman Jay Clayton).

[15] Nathaniel Popper, *Initial Coin Offerings Horrify A Former SEC Regulator*, N.Y. TIMES (Nov. 26, 2017) (quoting former SEC Commissioner, Joseph Grundfest).

### ii.  Plaintiff and other Class members were passive investors who had a reasonable expectation of profit from the efforts of others

Defendants' attempts to label these payments as "contributions" cannot overcome the obvious economic substance of the transaction: an investment made with the expectation of a profit. Defendants' own statements acknowledge as much:

- When a Reuters reporter asked Defendant Timothy Draper "how much he donated during the Tezos fundraiser, he replied via email, 'You mean how much I **bought**? A lot.'" (¶67)

- Draper has also stated that "[a]ll tokens we hope to receive that we didn't buy in the Pre-sale (alongside with all the other **investors** who participated) will vest over time with the founders' tokens." In the same statement, Draper said: "If [Defendants Arthur Breitman and Kathleen Breitman] are successful [in developing the Tezos tokens], they might just transform society, and we will all be better off as a result, and then, **maybe 5 or ten years down the road, my investors and I might get rich**." (¶83).

- Defendant Kathleen Breitman represented that Defendants were "selling" the Tezos tokens, stating: "we're **selling**, rather the Foundation is recommending an allocation of tokens to the genesis block based on donations to a Swiss non-profit. And there's a suggested allocation amount. So one bitcoin for 5000 tokens. And were going to **sell** them over the course of, rather have them up for donation over the course of two weeks." (¶73).

- The Tezos.com Frequently Asked Questions ("FAQ") webpage states that "token holders can receive **rewards** for participating in the proof-of-stake consensus mechanism" (¶83).

- The Tezos Overview document stated developers will be "**compensate[d]**" with Tezos tokens that "have **immediate value** rather than forcing them to seek corporate sponsorships, foundation salaries, or work for Internet fame alone" (¶83).

- The statement on the Tezos Overview document stated that long-term governance goals include "favoring decisions that tend toward **increasing the value of the tokens**." (¶83).

It is "the substance of the transaction rather than its form [that] governs[.]" *Moreland v. Dep't of Corps.*, 194 Cal. App. 3d 506, 512 (1987). Courts do not—and this Court should not—hesitate to re-characterize "donations" that are, in fact, payments.

In *Warfield v. Alaniz*, the Ninth Circuit addressed this issue in a lengthy, well-reasoned opinion. 569 F.3d 1015 (9th Cir. 2009). It rejected defendants' argument that "purchasers of … gift annuities made no investment of money because they lacked the intent to realize a financial gain and were motivated solely to make a charitable donation," and held that the "gifts" were in fact purchases of securities where, as here, the annuities were marketed as investments. *Id.* at 1021. Other courts

APPLICATION FOR TRO - 12
Case No.:

have, in analogous circumstances, reached the same result. *See, e.g.*, *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1080 (N.D. Cal. 2015); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, No. CIV.A. 4:14-0941, 2015 WL 1034254, at *17 (S.D. Tex. Mar. 10, 2015); *In re Heritage Village Church and Missionary Fellowship, Inc.*, 137 B.R. 888, 891 (Bankr. D.S.C. 1991). Even the Breitmans' lawyer agrees: "If the underlying economic substance of the ICO looks or feels like an investment, simply calling it by another name (for example, a 'donation', 'presale' or 'crowdsale') may not carry the day."[16]

Finally, there can be little question that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). In Draper's words, "Arthur and [K]athleen [Breitman] … made it clear to me and the other purchasers that the token would require time to develop. If they are successful, they might just transform society, and we will all be better off as a result, and then, maybe 5 or ten years down the road, my investors and I might get rich." ¶83. Referring to a similar initiative (Polychain), Defendant Kathleen Breitman stated that "[w]e created a product that was purchased by VC **investors** without the traditional equity investment model because of the anticipated **appreciation** of our token." ¶83. In other words, just like the investor who purchases a stock or a bond, Plaintiff and other Class members who participated in the Tezos ICO were passive investors who hoped to benefit from capital gains.

### c. The California Securities Act and the UCL Forbid Selling or Participating In the Sale of Unregistered Securities

Once the Court determines that the Tezos ICO was subject to United States and California law and that the Tezos tokens are securities, there should be no question that Plaintiff is likely to prevail on the merits.

---

[16] *See* Benjamin Sauter, David McGill, and Brian Klein, *Initial Coin Offerings: Where the SEC Might Stand*, COINDESK (June 16, 2017), https://www.coindesk.com/initial-coin-offering-ico-where-sec-might-stand/.

1    Section 25110 of the California Corporations Code provides that "[i]t is unlawful for any

2    person to offer or sell in this state any security in an issuer transaction (other than in a transaction

3    subject to Section 25120), whether or not by or through underwriters, unless such sale has been

4    qualified under Section 25111, 25112 or 25113 … or unless such security or transaction is exempted

5    or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part."

6    Defendants made no effort to qualify their non-exempt sales via registration (Section 25111),

7    notification (Section 25112), or permit (Section 25113) and therefore violated Section 25110. In turn,

8    Section 25503 provides that any person who violates Section 25510 may be liable in a private action

9    to any person acquiring the security. And where, as here, there is a primary violation of Section

10    25503, "secondary liability may … exist under sections 25504 and 25504.1 for others who

11    participated in the violation in the specific roles listed in those sections without any further need for

12    privity between these secondarily liable actors and the plaintiff." *Moss v. Kroner*, 197 Cal.App.4th

13    860, 875 (2011).

14    Similarly, subject to limited exceptions not applicable here, Section 5 of the Federal

15    Securities Act of 1933 (the " '33 Act") prohibits offering, selling, or participating[17] in the sale of any

16    security in interstate commerce unless a registration statement has been filed with and declared

17    effective by the SEC—which did not happen here. 15 U.S.C. § 77(e). Section 12(a)(1) of the

18    Securities Act creates a private right of action for violations of Section 5. 15 U.S.C. § 77(a)(1).

19    These violations of the '33 Act and the Corporations Code constitute "unlawful" conduct

20    violating the UCL. *See Moran v. Prime Healthcare Management Inc.*, 3 Cal.App.5th 1131, 1142

21    (2016) ("Under the unlawful prong, the UCL borrows violations of other laws ... and makes those

22    unlawful practices actionable under the UCL. Thus, a violation of another law is a predicate for

23    stating a cause of action under the UCL's unlawful prong.") (internal quotations omitted). The "UCL

24    contains no language supporting an exclusion for securities," *Roskind v. Morgan Stanley Dean*

25    *Witter & Co.*, 80 Cal.App.4th 345, 356 n.8 (2000), and "[v]iolations of federal statutes, including

26    _____

27    [17] "Those who had a necessary role in the transaction are held liable as participants." *SEC v. Murphy*,
626 F.2d 633, 650–51 (9th Cir. 1980).

28    APPLICATION FOR TRO - 14
Case No.:

those governing the financial industry, may serve as the predicate for a UCL cause of action." *Rose v. Bank of America, N.A.*, 57 Cal.4th 390, 394 (2013); *see also Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal.App.4th 688, 715 (2007) (sustaining UCL claim based on alleged manipulation of publicly traded securities).

### D. Plaintiff and the Class Will Suffer Irreparable Harm in the Absence of Preliminary Relief

Irreparable harm is shown where a judgment on the merits would be frustrated by a defendant making it uncollectible. *SEC v. Milan Capital Group, Inc.*, No. OO CIV. 108(DKC), 2000 WL 520653, at *2 (S.D.N.Y. Apr. 28, 2000) (*citing Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996)) (internal quotations omitted). Defendants' dissipation of assets can also constitute irreparable harm. *Transfirst Group, Inc. v. Magliarditi*, 2017 WL 2294288, at *10 (D. Nev. May 25, 2017) (*citing Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003)).

Here, Plaintiff and the Class will likely face irreparable harm unless an injunction is issued for several reasons.

Most importantly, there is reason to believe that Defendants are looting. They have provided very few updates about the development of the Tezos project, even though investors in the ICO were told it should have launched by now. ¶104. Similarly, because the project has not launched, investors have not received their promised Tezzie tokens in return for their investment, only a promise of future delivery. ¶64. Defendants Arthur and Kathleen Breitman have accused Defendant Gevers of "self-dealing, self-promotion and conflicts of interest" and claim that Gevers has been improperly "enriched" though seven-figure bonuses and fees out of the assets from the ICO. ¶¶102, 103. Meanwhile Gevers has accused the Breitmans of "character assassination," "misleading statements and outright lies" and accused his fellow board members, Ponz, and Schmitz-Krummacher of an "illegal coup." The Tezos Foundation promised an audit of the assets obtained through the ICO would be published in November, but recently fired its auditor and never provided the report. ¶112. Schmitz-Krummacher has resigned and Gevers will name his replacement. ¶28. Taken together, these facts raise significant concerns about the security of the funds provided by Plaintiff and the

APPLICATION FOR TRO - 15
Case No.:

1   class in the ICO. Unless a temporary restraining order freezes those funds in place, Plaintiff and the

2   putative class face a significant risk that their rescission and restitution remedies will be rendered

3   utterly illusory.

4           Even if Defendants could be trusted not to steal or hide the Foundation's assets, the

5   extraordinary volatility of the cryptocurrency market makes it necessary for Defendants to hold their

6   assets in cryptocurrency form to ensure that they can satisfy an equitable judgment. Defendants

7   collected 65,627 Bitcoin and 361,122 Ethereum as part of their illegal ICO. ¶5. That consideration

8   had a value of $232 million in U.S. dollars at the time of the ICO, but is worth over $1 billion now as

9   a result of the remarkable appreciation of Bitcoin and Ethereum since that time. *Id.*[18]

10          In the wake of the ICO, Defendants have taken steps to convert the cryptocurrencies they

11  received (*i.e.,* Bitcoin and Ether) into what they claim is a "conservative portfolio of cash, stocks,

12  bonds, and precious metals," and have "been slowly converting these assets into cash at a pace of

13  roughly 500,000 CHF" (or approximately $505,000 U.S. Dollars) "each day." ¶107. Defendants have

14  also stated that they intend to use $50 million of funds obtained through the ICO to invest in

15  "companies looking to build on the Tezos platform," ¶110, and have sought to spend some of the

16  funds on legal fees. ¶113. There are two reasons that this conversion threatens irreparable harm.

17          *First*, Defendants are required to provide rescission to the class in the form of the

18  cryptocurrency that a class member originally invested (*i.e.*, Bitcoin or Ether). *See, e.g.*, Cal. Corp.

19  Code § 25503 (a successful plaintiff is entitled "to recover the consideration he paid"). But

20  Defendants ongoing conversion of the class' cryptocurrency investments into fiat currency (*e.g.,* U.S.

21  Dollars or Swiss Francs) will make it increasingly difficult for Defendants to provide complete

22  rescission or restitution. For example, if Defendants converted 200 Bitcoin to cash on July 10, 2017,

23  they would have received approximately $491,200 U.S. Dollars. If Defendants were required to buy

24  back 200 Bitcoin today to provide recession to the class, they would need to pay approximately

25  $3,400,000 in U.S. Dollars to obtain those same 200 Bitcoin. The conversion of Bitcoin to cash (and

26  _____

27          [18] At the time of filing, 65,627 Bitcoin was worth $1.16 billion in U.S. Dollars; 361,122
     Ethereum was worth $154.6 million U.S. Dollars.

28  APPLICATION FOR TRO - 16
    Case No.:

the continued conversion, should it be allowed to occur absent a temporary restraining order) already makes it exceedingly unlikely that Defendants could ever provide full restitution to the class. If Bitcoin continues its exponential appreciation in value, this problem will be exacerbated unless the Court enters a TRO.[19]

*Second*, Defendants have also stated their intent to spend at least $50 million on "investments" into Tezos-related companies, and to spend additional Tezos foundation assets obtained from the ICO on personal legal fees related to this and other actions. ¶113. Defendant Gevers has purportedly sought significant bonuses and fees from the assets obtained in the ICO. ¶¶102, 103. Absent a temporary restraining order, the funds used to make these investments (many of which may be to related or otherwise interested parties), to pay attorney fees, or to pay bonuses or fees, will be unavailable to Plaintiff and the class.

In short, there is significant reason to suspect that Defendants will be unable to provide rescission (or recessionary damages) to Plaintiffs if they are permitted to maintain control over the Foundation and its assets. Indeed, the Swiss Foundation structure itself appears to have been designed to move the assets obtained through the ICO to a location where they will be difficult to collect. ¶50. The Court should enjoin all Defendants because the sale and conversion of these ICO proceeds is possible only when Defendants participate in a "multi-signature procedure," which requires the use of "spending and several security checks" controlled by Defendants. ¶32.  Given that it is currently unknown whose signatures are required, a temporary restraining order preventing all Defendants from participating in this "multi-signature procedure," would have the effect of stopping any additional dissipation of assets or conversion of cryptocurrencies obtained during the illegal ICO and would help preserve at least some of the pool of assets improperly obtained in the ICO.

---

[19] Even if Bitcoin or Ethereum decline in value, a temporary restraining order maintains the status quo for those proceeds. Because a temporary restraining order would prevent Defendants from distributing or converting those cryptocurrencies, they would be available to Plaintiffs who obtain rescission, regardless of the price movement of those cryptocurrencies.

APPLICATION FOR TRO - 17
Case No.:

**E.  The Balance of Equities Weighs In Favor Of Plaintiff and the Class**

In evaluating the balance of equities, the Court "must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.[20]

As explained above, Plaintiff and the class are likely to suffer significant harm, and will be unlikely to ever receive rescission of their investments absent injunctive relief. On the other hand, the harm to Defendants is limited. Plaintiff is not requesting a freeze of all of Defendants' assets—he is simply asking that Defendants be enjoined from spending, converting, or dissipating the cryptocurrency assets that they obtained through a plainly illegal offering, until additional discovery and an accounting can occur.

This Court has found that where a party has likely obtained funds through fraud or other illegality, the balance of the equities weighs in favor of a TRO preventing the dissipation of assets. *See, e.g., SEC v. Bar Works Capital, LLC*, No. 17-CV-04396, 2017 WL 4642311, at *7 (N.D. Cal. Oct. 16, 2017) ("The equities weigh in favor of granting the asset freeze. Without a freeze, defrauded investors may not be able to recover moneys wrongfully obtained from them. . . . [Plaintiff's] interests, particularly in light of the showing that the [p]roperty was likely purchased with fraudulently-obtained funds, outweighs any harm of temporarily preventing [Defendant] from dissipating its assets.").

Furthermore, the temporary restraining order sought by Plaintiffs does not encumber any Defendants' personal assets, but instead asks only for Defendants to be limited from dissipating the Tezos Foundation assets obtained via an illegal unregistered offering. "[A]s long as the preliminary injunction is sufficiently limited such that it does not freeze [Defendant's] personal funds to cover reasonable living expenses, the balance of equities tips in plaintiffs' favor." *Fidelity Nat. Title Ins. Co. v. Castle*, No. C 11-00896 SI, 2011 WL 5882878, at *7 (N.D. Cal. Nov. 23, 2011) (citing

---

[20] Courts in the Ninth Circuit take a "sliding scale" approach when balancing equities in determining whether to grant a preliminary injunction. *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) ("Under our 'sliding scale' approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."). Here, Plaintiffs have made a particularly strong showing on both the likelihood of success and the likelihood of irreparable harm, necessitating a lower showing when balancing the equities between the sides.

1   *Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) (finding that where an asset freeze permitted

2   defendant to cover normal living expenses and legal fees, the district court correctly concluded that a

3   narrowly tailored asset freeze would prejudice defendant less than denial of relief would prejudice

4   plaintiffs)).

5   **F. A Temporary Restraining Order is in The Public Interest**

6   "In exercising their sound discretion, courts of equity should pay particular regard for the

7   public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24

8   (citing *Romero-Barcelo*, 456 U.S. 305, 312 (1982)). However, "[w]hen the reach of an injunction is

9   narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at

10  most a neutral factor in the analysis rather than one that favors granting or denying the preliminary

11  injunction." *Kremen v. Cohen*, No. 5:11-cv-05411-LHK, 2011 WL 6113198, at *7 (N.D. Cal. Dec. 7,

12  2011).

13  Here, the public interest weighs heavily in favor of granting a temporary restraining order. In

14  bold defiance of California's investor protection laws, Defendants have obtained payments worth

15  hundreds of millions of dollars from Plaintiff and thousands of other investors in an unregistered

16  securities offering. The temporary restraining order sought protects those affected investors and

17  reinforces California's laws. Any negative impact of the temporary restraining order will be felt not

18  by the public, but by Defendants, who will merely be prevented from further dissipating assets they

19  obtained in an illegal offering.

20  **IV. CONCLUSION**

21  For all the foregoing reasons, the Court should enter a TRO freezing all assets of Defendants

22  collected via or derived from the Tezos ICO and restraining and enjoining Defendants from selling,

23  transferring, converting, or otherwise disposing of any of the ICO Proceeds or taking any action to

24  authorize anyone else to sell, transfer, convert, or otherwise dispose of any of the ICO Proceeds until

25  Plaintiff has had sufficient time to conduct appropriate discovery in preparation for a preliminary

26  injunction hearing and this Court issues a ruling on its Order to Show Cause Why a Preliminary

27  Injunction Should Not Issue.

28  APPLICATION FOR TRO - 19
    Case No.:

DATED: December 14, 2017

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:_____/s/  *Reed R. Kathrein*_____
Reed R. Kathrein (139304)
Peter E. Borkon (212596)
Danielle Charles (291237)
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email:  reed@hbsslaw.com
          peterb@hbsslaw.com
          daniellec@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Jason M. Leviton, *pro hac vice to be submitted*
Joel A. Fleming (281264)
Jacob A. Walker (271217)
BLOCK & LEVITON LLP
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Email:  jason@blockesq.com
          joel@blockesq.com
          jake@blockesq.com

*Attorneys for Plaintiff*

APPLICATION FOR TRO - 20
Case No.: