BAKER MARQUART LLP
BRIAN E. KLEIN (258486) (bklein@bakermarquart.com)
SCOTT M. MALZAHN (229204)
(smalzahn@bakermarquart.com)
2029 Century Park East, Suite 1600
Los Angeles, CA 90067
Telephone: (424) 652-7814
Facsimile: (424) 652-7850

COOLEY LLP
PATRICK E. GIBBS (183174) (pgibbs@cooley.com)
JEFFREY M. KABAN (235743) (jkaban@cooley.com)
SAMANTHA A. KIRBY (307917) (skirby@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:   (650) 843-5000
Facsimile:    (650) 849-7400

DANIEL L. SACHS (294478) (dsachs@cooley.com)
1299 Pennsylvania Ave. NW Suite 700
Washington, DC 20004
Telephone: (202) 728-7114
Facsimile: (202) 842-7899

Attorneys for Defendant
DYNAMIC LEDGER SOLUTIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRUCE MACDONALD, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DYNAMIC LEDGER SOLUTIONS, INC., a Delaware corporation, TEZOS STIFTUNG, a Swiss foundation, KATHLEEN BREITMAN, an individual, ARTHUR BREITMAN, an individual, TIMOTHY COOK DRAPER, an individual, DRAPER ASSOCIATES, JOHANN GEVERS, DIEGO PONZ, GUIDO SCHMITZ-KRUMMACHER, BITCOIN SUISSE AG, NIKLAS NIKOLAJSEN and DOES 1-100, INCLUSIVE,<br><br>Defendants. | Case No.  3:17-cv-07095-RS<br><br>**DEFENDANT DYNAMIC LEDGER SOLUTIONS, INC.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Date:        December 19, 2017<br>Time:        10:00 a.m.<br>Judge:       Hon. Richard Seeborg<br>Courtroom:   3, 17th Floor<br>Trial Date:  Not yet set |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1

2

## Table of Contents

**Page**

I.   INTRODUCTION ....................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................... 3

    A.   Background Regarding Distributed Ledger Technology................................. 3

    B.   History of Dynamic Ledger Solutions and the Tezos Foundation.................. 4

    C.   The Tezos Foundation Fundraiser ..................................................... 6

    D.   Dispute With Tezos Foundation ......................................................... 8

    E.   Plaintiff Files Suit Months Later And Immediately Files A TRO................. 8

         Plaintiff filed suit on December 13, 2017, roughly five months after his

III. LEGAL STANDARD ............................................................................- 9 -

IV.  ARGUMENT ....................................................................................... 10

    A.   Plaintiff Is Not Entitled To Relief on Behalf of the Class ......................- 10 -

    B.   Plaintiff  Will Not Suffer Irreparable Harm In The Absence Of An
         Injunction ...................................................................................- 12 -

         1.   Plaintiff Fails To Meet His Burden To Show Likelihood Of
              Irreparable Harm .................................................................- 12 -

         2.   Any Alleged Harm Was Self-Inflicted Because Plaintiff Was
              Well Aware Of The Characteristics Of XTZ Tokens When He
              Made His Contribution ..........................................................- 15 -

         3.   Plaintiff's Delay Negates His Claim Of Irreparable Harm............- 16 -

    C.   The Balance Of Equities Weighs In Favor Of Defendants........................ 16

    D.   A TRO Is Not In The Public Interest ................................................. 17

    E.   Plaintiff Is Not Likely To Prevail On The Merits................................- 17 -

         1.   Plaintiff Has Not Shown The Tezos Fundraiser Was An "Offer
              And Sale Of Securities".........................................................- 18 -

         2.   Plaintiff Cannot Proceed With This Action ................................- 19 -

V.   CONCLUSION ..................................................................................- 20 -

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

-i-

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1

**Table of Authorities**

2
**Page(s)**

3
**Cases**

4
*Aniel v. GMAC Mortg., LLC,*
5
   2012 WL 5373388 (N.D. Cal. Oct. 30, 2012)....................................................................16

6
*Arthur J. Gallagher, & Co. v. Edgewood Partners Ins. Ctr.,*
   2008 WL 205274 (N.D. Cal. Jan. 23, 2008)....................................................................19
7

8
*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,*
   134 S. Ct. 568 (2013)......................................................................................................20

9
*Baytree Cap. Assocs., LLC v. Quan,*
10
   2008 WL 38912226 (C.D. Cal. Aug. 18, 2008)................................................................12

11
*Bresgal v. Brock,*
   843 F.2d 1163 (9th Cir. 1987)........................................................................................10
12

13
*Burrows v. Onewest Bank,*
   2012 WL 12882754 (N.D. Cal. April 5, 2012)...................................................................9

14
*California Pawnbrokers Ass'n, Inc. v. Carter,*
15
   2016 WL 6599819 (E.D. Cal. Nov. 8, 2016)...................................................................15

16
*Clouser v. Ion Beam Applications, Inc.,*
   2004 WL 540514 (N.D. Cal. March 18, 2004)................................................................15
17

18
*Coinflip, Inc., d/b/a Derivabit and Francisco Riordan,*
   CFTC Docket No. 15-29 (Sept. 17, 2015)...................................................................4, 18

19
*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
20
   92 F.3d 1486 (9th Cir. 1996)..........................................................................................11

21
*Flores v. Aurora Loan Servs., LLC,*
   2012 WL 1029569 (N.D. Cal. March 26, 2012).................................................................9
22

23
*In re Focus Media Inc.,*
   387 F. 3d 1077 (9th Cir. 2009).......................................................................................15

24
*Herb Reed Enters. LLC v. Florida Ent't Mgmt., Inc.,*
25
   736 F.3d 1239 (9th Cir. 2013)........................................................................................12

26
*Johnson v. Couturier,*
   572 F.3d 1067 (9th Cir. 2009)........................................................................................12

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS**

*Lydo Enters. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ..............................................................................16

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972).......................................................................................................20

*Malletier v. Sadia*,
    2015 WL 7351465 (N.D. Cal. Nov. 20, 2015) .........................................................15

*Morrison v. Nat. Australia Bank Ltd.*,
    561 U.S. 247 (2010)...................................................................................................20

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*,
    743 F.2d 1365 (9th Cir. 1984 ), *vacated and remanded on other grounds*, 481
    U.S. 1009 (1987)........................................................................................................10

*Noa v. Key Futures, Inc.*,
    638 F. 2d 77 (9th Cir. 1980) ......................................................................................19

*Patterson Vegetable Co., LLC, v. Superior Foods, Inc.*,
    2012 WL 5413467 (N.D. Cal. Nov. 6, 2012) ...........................................................14

*Schultz v. Armstrong*,
    2012 WL 3201223 (D. Idaho Aug. 2, 2012)............................................................11

*SEC v. Bar Works Capital, LLC*,
    2017 WL 4642311 (N.D. Cal. Oct. 16, 2017)..........................................................15

*SEC v. Belmont Reid & Co. Inc.*,
    794 F. 2d 1388 (9th Cir. 1986) ..................................................................................19

*SEC v. Shavers*,
    2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ...........................................................18

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946).........................................................................................17, 18, 19

*Sinva v. Meriill, Lynch, Pierce, Fenner & Smith Inc.*,
    253 F. Supp. 359 (1966) (S.D.N.Y. 1966)................................................................19

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...................................................................................17

*In re Syncor ERISA Litig.*,
    516 F. 3d 1095 (9th Cir. 2008) ..................................................................................13

*TPW Mgmt. LLC v. Yelp Inc.*,
    2016 WL 6216879 (N.D. Cal. Oct. 25, 2016)..........................................................12

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS**

*Trachsel v. Buchholz,*
   2009 WL 839117 (N.D. Cal. Mar. 30, 2009)................................................................18

*United Housing Found. v. Forman,*
   421 U.S. 837 (1975)......................................................................................................19

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ........................................................................................9

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982).........................................................................................................9

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008).............................................................................................................9

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......................................................................................16

Cal. Corp. Code § 25110 ...................................................................................................16

Civil Code Article 80 ...........................................................................................................5

Civil Code Article 83b .........................................................................................................5

Civil Code Article 84 ...........................................................................................................5

Exchange Act Section 10(b) ..............................................................................................18

Securities Act of 1933 ........................................................................................................16

Cooley LLP
Attorneys At Law
Palo Alto

-iv-

**Defendant's Opposition to Plaintiff's Ex
Parte Application for TRO
Case No.: 3:17-cv-07095-RS**

1

## I.     INTRODUCTION

2
Plaintiff Bruce MacDonald ("Plaintiff") asks this Court to freeze $1.2 billion of assets held by

3
a Swiss foundation and paralyze the Tezos software development efforts to preserve his ability to

4
collect approximately $10,000 should his first-of-a-kind lawsuit be successful.  The Court should

5
decline to impose this extraordinary remedy.

6
In July of 2017, the Tezos Foundation, a Swiss Foundation, held a worldwide fundraiser that

7
was designed to further the Foundation's purpose of promoting and fostering the use of the Tezos

8
network protocol.  Contributors to that fundraiser were informed, in advance, that contributions

9
qualified as "non-refundable donations," that XTZ tokens "do not represent or constitute any

10
ownership right or stake, share or security or equivalent right in or relating to Tezos," and that the

11
Foundation "cannot guarantee that Contributors shall have any allocation of XTZ when the Tezos

12
Network is created." Tens of thousands of contributors from around the globe participated in the

13
fundraiser, contributing approximately $232 million worth of Bitcoin and Ether to the project.  A few

14
weeks after the fundraiser, a dispute arose between the founders of the Tezos project, Arthur and

15
Kathleen Breitman, and a member of the Foundation's board of directors, Johann Gevers, and the

16
development of the Tezos network has proceeded more slowly than expected at the time of the

17
fundraiser.  Sensing opportunity, plaintiffs' lawyers began trolling for clients beginning in October of

18
2017.  Between October 25, 2017 and November 28, 2017, four plaintiffs filed lawsuits claiming that

19
the fundraiser was an unregistered sale of securities—this despite the many disclosures that

20
contributors had received that XTZ tokens are not securities and despite acknowledgements in the

21
terms of contribution that contributors did not seek to obtain XTZ tokens "for the purpose of

22
speculative investment."  On December 4, 2017, one of those plaintiffs ("Okusko") filed a motion for

23
a preliminary injunction seeking an order, among other things, freezing Defendants' accounts holding

24
the contributed funds.  That motion is currently scheduled to be heard on January 11,

25
2018.  Apparently worried that Mr. Okusko's lawyers would get control of the case, a new plaintiff—

26
represented by a different group of lawyers—entered the fray.  Thus, on December 13, 2017, plaintiff

27
MacDonald filed a complaint, and then immediately applied *ex parte* for a temporary restraining order

28
("TRO").

MacDonald's request for a temporary restraining order is meritless and should be denied.  The application does not come close to showing a risk of any irreparable harm at all, much less the kind of imminent harm needed to justify the extraordinary remedy of a temporary restraining order.  Mr. MacDonald is just one contributor, and his contribution to the fundraiser amounted to approximately $5,000 worth of Ether at the time.  By Plaintiff's own reckoning, the Bitcoin and Ether raised by the Foundation in the fundraiser is now worth in excess of $1 billion.  In the unlikely event that Mr. MacDonald succeeds with his claim, there is no risk at all – much less an immanent risk – that he will be left without a remedy.  Mr. MacDonald seeks to avoid this problem by purporting to represent a class of "all persons" who contributed to the Tezos fundraiser.  But there is no "class"—Mr. MacDonald has done nothing more than file a complaint styled as a class action.  He has made no showing that a certifiable class exists, much less that he would be an appropriate representative of any such class.  Perhaps most importantly, there is no reason for the Court to believe that the contributors to the Tezos fundraiser as a group—or even a meaningful number of them—actually want the remedy that Mr. MacDonald seeks here, namely, a complete shutdown of the project and a return of the money raised in the fundraiser.  Quite the contrary, over 1,200 contributors have signed a petition publicly urging the Foundation to get moving with the development of the Tezos network, the project that the fundraiser was designed to fund.  Simply put, Mr. MacDonald does not speak for any "class" of Tezos contributors, nor does he seek to further their interests.  At most, he seeks to further his own interests and those of his lawyers.

In any event, although Mr. MacDonald purports to seek a TRO to prevent "looting" of the fundraiser proceeds, he cites no evidence that any looting has ever occurred, and he cites no evidence or any reason to believe that any looting will occur in the future.  He relies almost entirely on months-old press accounts of a dispute between the Breitmans and one member of the Foundation's board, none of which suggests that any "looting" is imminent.  He ignores the fact that Bitcoin Suisse has affirmed that the collected funds are secure and not at risk of being lost or mismanaged.  Simply put, the "emergency" cited in the *ex parte* application has been invented by Mr. MacDonald and his lawyers.

Nor has Mr. MacDonald shown any likelihood of success on the merits of his claims.  Mr.

MacDonald has not set forth a sufficient factual record to permit a court to find that he will likely prevail on his novel application of a fact-intensive standard. In addition, the choice of law, choice of forum and foreign title-holder provisions in the Contribution Terms preclude his action from succeeding in this Court.

## II.   FACTUAL BACKGROUND

### A.   Background Regarding Distributed Ledger Technology

Distributed ledger (or blockchain) technology is, at a high level, a digital system of keeping records. The technology allows computers to maintain the same record of transactions across many different computers at the same time. One benefit of blockchain technology is it enables these shared records, or the shared ledger, to exist in many places at once. It is thus decentralized, which means there is no central point where the shared ledger can be corrupted or attacked. Another benefit of blockchain technology is, often, the shared ledger cannot be changed without the agreement of a majority of its users.  Finally, the shared ledger can be accessed by any computer with a connection to the internet.

To access the shared ledger, computers must run the same software protocol. For instance, computers must run the same version of the Bitcoin protocol to operate the Bitcoin shared ledger (or Bitcoin network). Users can record transactions[1] and access decentralized computer applications on the shared ledger. The units used to transact on the shared ledger are often referred to as cryptocurrency. Thus, one unit of bitcoin sent over the Bitcoin protocol can be referred to as one unit of cryptocurrency. The shared ledger is accessible to all network participants, but not controlled or maintained by any single entity.  Rather, the "decentralized" shared ledger exists simultaneously on computers around the world that operate the same protocol.

Bitcoin, a network run by computers operating the Bitcoin protocol, was the first blockchain-based network.  Bitcoin is also the cryptocurrency native to the Bitcoin protocol.  Ethereum, a distinct network run by computers operating the Ethereum protocol, is also a blockchain-based network. The Bitcoin network allows for the secure transfer of bitcoin; the Ethereum network, in addition, allows

---

[1] Groups (or blocks) of transactions are processed together, and the ledger of transactions is the complete series (or chain) of all transactions on the network.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 3 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1   users to access the computing power that supports the Ethereum network.  To do so, Ethereum uses a

2   cryptocurrency that is also referred to as a "token," called "ether" or "ETH."   The Ethereum

3   Foundation describes "ETH" as "a fuel -- for operating the distributed application platform Ethereum.

4   It is a form of payment made by the clients of the platform to the machines executing the requested

5   operations."[2]  In sum, users pay ETH tokens to access the computing power of computers running the

6   Ethereum protocol.  Bitcoin – the cryptocurrency – and ETH – the cryptocurrency or token – have

7   been deemed virtual currencies because they serve as the required currency for transacting on their

8   native networks.[3]

9       The Bitcoin protocol and the Ethereum protocol are still being developed and improved.

10  Because no one person or set of people owns a decentralized blockchain, blockchains such as Bitcoin

11  and Ethereum face governance challenges maintaining and continually improving their network's

12  protocols.  The Tezos network was specifically designed to solve the governance problem that besets

13  any decentralized blockchain. The Tezos protocol was designed to permit stakeholders (i.e., those

14  running the protocol) to approve protocol upgrades that could be automatically deployed while the

15  network is in operation.  (Ex. 1 at 4[4].) Hence, the Tezos network was designed to be the first

16  decentralized ledger that could make upgrades to its protocol without requiring the creation of a new

17  protocol.  (*Id.*)

18      In the same way that ETH fuels the Ethereum network, the XTZ token (or "Tezzie") fuels the

19  Tezos network.  The XTZ token is a native, digital token that allows users to pay to either send

20  transactions or to access applications on the Tezos network.  Users pay XTZ tokens to access the

21  computing power of computers running the Tezos protocol.  As such, XTZ tokens serve both as a

22  means to access the Tezos network and as a medium of exchange among developers and consumers

23  that use the Tezos network and its applications.

24      **B.    History of Dynamic Ledger Solutions and the Tezos Foundation**

25      Arthur and Kathleen Breitman (the "Breitman Defendants") began developing software to

26

27  [2] See https://www.ethereum.org/ether.
     [3] *See Coinflip, Inc., d/b/a Derivabit and Francisco Riordan*, CFTC Docket No. 15-29 (Sept. 17, 2015)
     ("Virtual currencies such as bitcoin are commodities").

28  [4] All references to "Ex. _" shall refer to Exhibits to the Declaration of Jeffrey M. Kaban.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS**

1    support the Tezos network in March 2014.  (Ex. 1 at 3.)  For this purpose, the Breitman Defendants

2    founded defendant Dynamic Ledger Solutions ("DLS"), a Delaware corporation.  (Ex. 1 at 11.)  DLS

3    owns, among other things, all Tezos-related intellectual property. *See id.*

4        The Tezos project was structured similarly to the Ethereum project.  Like Tezos, the Ethereum

5    protocol was originally created by a team of developers that established the network protocol and a

6    network token.  The Ethereum project is guided by a nonprofit entity based in Zug, Switzerland called

7    the Ethereum Foundation.  The Ethereum Foundation's purpose "is to promote and support Ethereum

8    platform and base layer research, development and education to bring decentralized protocols and

9    tools to the world that empower developers to produce next generation decentralized applications

10   (dapps), and together build a more globally accessible, more free and more trustworthy Internet."[5]  In

11   2014, the Ethereum project raised funds by accepting donations from the public in exchange for the

12   future delivery of ETH tokens.[6]  To date, to the best of Defendants' knowledge, no one has suggested

13   that ETH is a security or that the Ethereum offering was a securities offering.

14       Similar to the Ethereum project, DLS is separate and distinct from the Tezos Foundation (the

15   "Foundation").  The Foundation is an independent entity based in Zug, Switzerland that is seeking

16   non-profit status.  (Ex. 1 at 8.)  The Foundation was organized under Swiss law.  Under Swiss law, a

17   foundation is an autonomous legal entity consisting of a pool of assets committed to one or more

18   defined purposes.  (*See* Swiss Civ. Code art. 80.)  Similar to the Ethereum Foundation, the

19   Foundation's goal is to "promote and foster the use of the Tezos blockchain, its technology, and its

20   ongoing development." (Ex. 1 at 8.)  The Breitman Defendants are not members of the Foundation

21   Board, have no formal role with the Foundation, or control over the Foundation.  (*Id*.)  The members

22   of the Foundation board have fiduciary duties to act in the best interest of the Foundation.[7]  In addition,

23   the Foundation is regulated by the Swiss Supervisory Authority of Foundations.  (*See* Swiss Civ. Code.

24   Art. 84.)  The Supervisory Authority acts to ensure that a foundation's assets are used to further the

25   foundation's purpose.  Under Swiss law, the Foundation must provide the Supervisory Authority with

26

27   [5] *See* https://www.ethereum.org/foundation.
     [6] *See* https://www.ethereum.org/ether.

28   [7]              *See*              https://uk.practicallaw.thomsonreuters.com/8-633-
     1801?transitionType=Default&contextData=(sc.Default)&firstPage=true&bhcp=1

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1   an annual activity report, an audit report, and accounts of the foundation.  (*See id*.)  Further, Swiss law

2   provides that a foundation must appoint an external and independent auditor to audit the foundation's

3   financial statements.  (*See* Swiss Civ. Code Art. 83b.)  The Supervisory Authority also must be notified

4   of, among other things, any change in the composition of a foundation's board or any change or

5   modification of the foundation's bylaws.[8]  Moreover, the Supervisory Authority's power is broad.  For

6   example, it can intervene in a foundation's activities and issue binding decisions.  It can also remove

7   board members from a foundation.  (*See id*.)

8   ## C.    The Tezos Foundation Fundraiser

9        In July 2017, the Foundation—not DLS or the Breitman Defendants—conducted a fundraiser.

10  (Ex. 1 at 10.)  The Foundation accepted contributions that were governed by a set of Contribution

11  Terms ("Terms").[9]   (Ex. 2.)   Pursuant to the Terms, and consistent with Swiss law governing

12  foundations, contributions made during the fundraiser "qualified as a non-refundable donation,"

13  except for a portion of an administrative support fee. (Ex. 2 at 3.1(12).) The Terms made it abundantly

14  clear that the Foundation was accepting donations, not soliciting investments.  No one contributing to

15  the fundraiser could be under a mistaken impression about these Terms.  The Terms provided that the

16  document "does not constitute a prospectus, is not a solicitation for investment and does not pertain in

17  any way to an offering of securities in any jurisdiction."  (Ex. 2 at 1.8.)  Further, as part of the

18  agreement, the person making the contribution represented to the Foundation:

19         The Contributor understands and accepts that XTZ do not represent or
20         constitute any ownership right or stake, share or security or equivalent
           right in or relating to TEZOS, the Client, the Tezos Network and/or any
21         software, any public or private company, corporation entity or property.
           (Ex. 2 at 2(10))

22         By donating to the [Foundation] . . . the Contributor represents and
23         warrants that . . . the Contributor deeply understands the functionality,
           usage, storage . . . and intricacies associated with cryptographic tokens
24         . . . and intends to use XTZ to participate in network governance, mining
           activities or connecting private networks.  (Ex. 2 at 2(11(a)))

25

26  [8]          See          also          https://uk.practicallaw.thomsonreuters.com/8-633-
    1801?transitionType=Default&contextData=(sc.Default)&firstPage=true&bhcp=1.)
27  [9] The Plaintiff in the *Okusko* matter concedes that contributors "expressly" agreed to the Terms in
    making the contribution.  (See *Okusko* Complaint, ¶ 11.)  The MacDonald Plaintiff acknowledges the
28  Terms but does not address whether he agreed to the Terms.

> The Contributor is not contributing to obtain XTZ for the purpose of speculative investment.  (Ex. 2 at 2(11(f)))

The Terms include a number of other provisions that are relevant to Plaintiff's motion, including but not limited to the following:

> The Contributor waives the right to participate in a class action lawsuit . . . against any entity or individual involved with the Contribution to Tezos, with the allocation of XTZ and with the operation of the Tezos Network.  (Ex. 2 at 2(11(h)))

> The Contribution Software and the Client are located in Alderney. Consequently, the contribution procedure, the XTZ creation and XTZ allocation is considered to be executed in Alderney.  (Ex. 2 at 35 ¶ 46.)

> The applicable law is Swiss law.  Any dispute arising out of or in connection with the creation of the XTZ and the development and execution of the Tezos Network shall be exclusively and finally settled by the ordinary courts of Zug, Switzerland.  (Ex. 2 at 10(48).)

Additionally, prior to the fundraiser, the Foundation stated that it would recommend an allocation of XTZ tokens based on donations received.  ( Ex. 1 at 10.)  The Foundation stated that XTZ tokens would not be allocated until the Tezos network begins operating, and it directed potential contributors to refer to the Terms for more detail.  (Ex. 1 at 10.)  The Terms state that the Foundation will recommend allocations of XTZ tokens "to reflect Contributions made," but that "since the Tezos Network will be operated by an independent community of participants" with the discretion to not adopt those recommendations, the Foundation "cannot guarantee to any party that they will have an initial allocation of XTZ."  (Ex. 2 at 1(3); *see also id.* at 4(29) ("TEZOS cannot guarantee to Contributors that they shall have any allocation and/or creation of XTZ as set forth in these terms.").)

The fundraiser took place from July 1 through July 14, 2017, and was highly successful. Contributors donated over 65,000 XBT and over 300,000 ETH—the equivalent of over $232 million at the time. [10]  (Exs. 6 & 12.)  The Foundation holds title to those funds.  (Ex. 2 at 1(1); Compl. ¶ 7.)

---

[10] Plaintiff alleges that the currencies worth $232 million at the time of contribution are now worth $1.2 billion.  (*See* Compl. ¶ 5.)

1    More than 30,000 wallets were funded in the fundraiser.[11]

2         Plaintiff alleges that during the fundraiser he contributed approximately 18.145 ETH to the

3    Foundation.  (Compl. ¶ 20.)

4         On July 18, 2017, just four days after the fundraiser, the Foundation announced that "[t]o best

5    serve the interest of the Tezos community, we intend to gradually diversify our position by slowly

6    selling some (but not all) of these holdings over the coming months and purchasing a conservative

7    portfolio of cash, stock, bonds and precious metals."  (Tab 9 of Kirby Binder.)  The Foundation

8    explained, "[o]ur strategy will be to balance the importance of diversification and risk management

9    with the cost of trading."  (*Id.*)  On August 10, 2017, the Foundation announced its intent to set up a

10   $50 million fund for developers and start-ups looking to build on the Tezos platform.  (Tab 10 of Kirby

11   Binder.)  That same day, the Foundation also reiterated its diversification strategy and explained that

12   it was converting the cryptocurrencies into cash at roughly CHF 500,000 per day.  (*Id.*)

13        Plaintiff does not allege that DLS has control over proceeds of the fundraiser, or that DLS ever

14   received a significant amount of funds from the Foundation.  Rather, Plaintiff claims that, several

15   months ago, DLS received just $60,000 from the proceeds of the fundraiser. (Compl. ¶ 111.)

16

17        **D.    Dispute With Tezos Foundation**

18        In September 2017, a dispute arose among the Breitman Defendants and Johann Gevers, a

19   member of the Foundation's board.  In particular, the Breitman Defendants raised concerns regarding

20   a bonus Gevers asked the Foundation Board to award him[12] and the Foundation's delay in

21   compensating developers to finish the Tezos network.  (Compl. ¶¶ 102-03.)  While five contributors

22   have filed lawsuits seeking a return of their Bitcoin or Ether donations, many other contributors still

23   seek and are advocating for the project to continue.  In fact, over 1,000 contributors signed an online

24   petition urging the Foundation to fund the development of Tezos network.  (Ex. 8.)

25

26

27

28

---

[11] See http://www.tezos.ch/fundraiser-statistics.html#fundraiser-statistics.
[12] The board did not award Gevers the bonus.

Cooley LLP
Attorneys At Law
Palo Alto

- 8 -

Defendant's Opposition to Plaintiff's Ex
Parte Application for TRO
Case No.: 3:17-cv-07095-RS

### E.   Plaintiff Files Suit Months Later And Immediately Files A TRO

Plaintiff filed suit[13] on December 13, 2017, roughly five months after his alleged donation to the Foundation.  Plaintiff purports to sue on behalf of all those who contributed to the Tezos fundraiser. He asserts only California law claims, and argues that California law applies to contributions made to a Swiss foundation despite agreeing to the terms, which state that Swiss law applies, and that any dispute should be resolved in Switzerland.  Further, he purports to represent everyone who contributed to this foreign entity's fundraiser regardless of whether the contributors live in California or even the United States (*i.e.* he would have this Court apply California law to a Swiss citizen's donation to a Swiss entity).

Despite knowing since just days after the fundraiser that the Foundation was diversifying its assets, and knowing since September of the dispute between Gevers and the Breitman Defendants, Plaintiff waited until December to file suit and seek a TRO.  Further, he filed the TRO before even serving the Complaint on the defendants (many of whom reside in Switzerland).

## III.   LEGAL STANDARD

A temporary restraining order ("TRO"), like a preliminary injunction, is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (legal standards applicable to TROs and preliminary injunctions are "substantially identical.").  A TRO should not issue in the normal course, but instead "only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Before receiving any form of injunctive relief in the federal courts, a plaintiff must establish "irreparable injury and the inadequacy of legal remedies." *Id*. at 312.  Accordingly, to win a TRO or preliminary injunction, a plaintiff must make a clear showing "that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Flores v. Aurora Loan Servs., LLC*, 2012 WL 1029569 at *1 (N.D. Cal. March 26, 2012)

---

[13] Plaintiff's complaint unfairly and unnecessarily disclosed personal information about the Breitman Defendants.

(Seeborg J.) (quoting *Winter*, 555 U.S. at 24).  Courts are "not mechanically obligated to grant an injunction for every violation of law . . . and should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger*, 456 U.S. at 312-13, and *Winter*, 555 U.S. at 24).  The critical difference between a TRO and a preliminary injunction is that to justify "creating the exigency that purportedly warrants ex parte relief," plaintiff must also show that he will suffer an "irreparable loss of rights" "before a preliminary injunction hearing may be held." *Burrows v. Onewest Bank*, 2012 WL 12882754 at *1-*2 (N.D. Cal. April 5, 2012).

## IV.   ARGUMENT

### A.   Plaintiff Is Not Entitled To Relief on Behalf of the Class

Plaintiff, who is just one of tens of thousands of people who contributed to the Tezos fundraiser, is asking the Court to issue a TRO that would freeze the project and that could cause irreparable harm to the entire endeavor.  But Plaintiff has made no showing that he speaks for all of the contributors, or even a sizable number of them.  In fact, at this point, there is every reason to believe that Plaintiff's desire to halt the project in its tracks and demand a refund is actually contrary to the wishes of many contributors: as noted above, over 1,200 contributors have signed an online petition urging the Foundation's board to continue advancing it.

Ignoring this fact, Plaintiff purports to speak for tens of thousands of absent contributors just because his lawyers styled his complaint as a putative class action.  Based solely on that pleading—and nothing more—Plaintiff purports to seek a TRO on behalf of the entire putative "class" consisting of "all persons" who contributed to the Tezos fundraiser.  But under established Ninth Circuit precedent, Plaintiff cannot obtain relief on behalf of a putative class before the Court determines whether class treatment is suitable.

The Ninth Circuit has repeatedly affirmed that an injunction "must be limited to apply only to the individual [named] plaintiffs unless the district judge certifies a class." *Zepeda*, 753 F.2d at 727; *Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984 )(remanding classwide injunction because, "in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs"), *vacated and remanded on other grounds*, 481 U.S. 1009 (1987).  This limitation stems from the "general rule that a federal court may not attempt to determine

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO
- 10 -
DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

the rights of persons not before the court." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). Applying that rule in *Zepeda*, for example, the Ninth Circuit vacated and remanded an injunction that purported to apply to non-party putative class members, even where the plaintiffs had demonstrated their individual entitlement to injunctive relief. *Zepeda*, 753 F.2d at 727-28 (collecting cases and discussing rule).

In light of *Zepeda*, Plaintiff has no basis to seek injunctive relief on behalf of the putative class of "all persons who purchased Tezos tokens" in July 2017. (Compl. ¶ 1.)  No class has been certified. Under *Zepeda*, Plaintiff cannot obtain relief on behalf of absent class members, whom he does not presently represent in the litigation and who are not before the court. *Zepeda*, 753 F.2d at 727; *see also Schultz v. Armstrong*, 2012 WL 3201223, at *4-6 (D. Idaho Aug. 2, 2012) (granting plaintiff's motion for individual injunctive relief, but declining to extend that relief to putative class members because, under *Zepeda*, "the Court lacks authority to enjoin [the defendant] on behalf of those not currently party to the suit").[14]

These concerns are especially pertinent here for several reasons.  First, more than 1,000 contributors to the Fundraiser have signed a petition calling on the Foundation to spend the funds. Thus, many of the class members that Plaintiff purports to represent have publicly stated that they want the Foundation to continue to spend the funds so that the Tezos network can be finalized and get up and running.  A court order freezing all the funds and preventing the completion of the Tezos network would go directly against the wishes of the other contributors that Plaintiff purports to represent.  Second, it is not even clear that a class could be certified in this matter.  Plaintiff and the other contributors waived their rights to class relief per the Terms of the contribution.  (Ex. 2 at 2.11(h) ("The Contributor waives the right to participate in a class action lawsuit . . . against any entity or individual involved with the Contribution to Tezos, with the allocation of XTZ and with the operation

---

[14] In the few instances in which courts have granted preliminary injunctions on a class-wide basis without first certifying a class, they have done so in circumstances where the named plaintiffs would otherwise effectively be denied relief. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (an injunction is not overbroad when it extends benefits to persons other than those before the Court "if such breadth is *necessary* to give prevailing parties the relief to which they are entitled.") (emphasis added).  This is not the case here.  Plaintiff only contributed 18 ETH to a fundraiser that raised over 300,000 ETH.  There is no credible claim that an injunction freezing all the proceeds is necessary to protect Plaintiff's contribution.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 11 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1    of the Tezos Network.").

2        **B.    Plaintiff Will Not Suffer Irreparable Harm In The Absence Of An Injunction**

3        To satisfy his burden with respect to establishing irreparable harm, Plaintiff must make a clear

4    showing that he will be imminently and irreversibly harmed absent an injunction. *Baldrige*, 844 F.2d

5    at 674 (9th Cir. 1988). Plaintiff fails to satisfy this standard for three independent reasons, each

6    sufficient to require denial of his Motion.

7        **1.    Plaintiff Fails To Meet His Burden To Show Likelihood Of Irreparable Harm**

8

9        Plaintiff has no basis and provides no evidence to support a claim of irreparable harm. He

10   offers no declaration or other evidence and relies exclusively on a verified complaint that consists

11   almost entirely of hearsay his lawyers have gathered from the internet. Conclusory or speculative

12   allegations are insufficient to show a likelihood of irreparable harm. *Herb Reed Enters. LLC v. Florida

13   Ent't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) (statements "grounded in platitudes rather than

14   evidence" are insufficient). Moreover, irreparable harm "means an injury that is imminent, and that

15   cannot be remedied by an award of money." *TPW Mgmt. LLC v. Yelp Inc.*, 2016 WL 6216879, at *

16   11 (N.D. Cal. Oct. 25, 2016). Here, Plaintiff has failed to offer anything more than absurd speculative

17   and conclusory allegations that "Defendants are looting." This does not even come close to

18   establishing "a *likelihood* of dissipation of the claimed assets, or other inability to recover monetary

19   damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)

20   (emphasis added).

21       As an initial matter, Plaintiff has not cited any evidence that even remotely suggests that any

22   funds have been siphoned off from the proceeds of the fundraiser. Rather, he recounts, over and over

23   again, public reports from internet posts and news articles about a dispute between one of the

24   Foundation's board members (Gevers) and the Breitman Defendants. To the extent Plaintiff makes

25   any specific allegations, he alleges only that DLS received a nominal amount of money several months

26   ago to fund work on the project, and that the Foundation has sold some bitcoin and ether in order to

27   diversify—all of which was publically disclosed months ago, and none of which even hints at a risk

28   of irreparable harm to *this Plaintiff*, much less *imminent* irreparable harm. As Plaintiff has made no

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 12 -

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS**

showing that any improper payments have been made or even that the Foundation has acted recklessly with the funds, much less that the Foundation's accounts have been looted, his unsupported allegations that the Foundation's funds might be looted in the future are insufficient. *Baytree Cap. Assocs., LLC v. Quan*, 2008 WL 38912226 at *11-14 (C.D. Cal. Aug. 18, 2008) (denying injunction and finding no irreparable harm where plaintiff's failure to adduce evidence of past looting rendered allegations that defendants may loot the company's assets insufficient).[15]

Further, the record shows that there are controls in place and that the funds are protected. Bitcoin Suisse, a separate entity from the Foundation, serves as mandatory co-signatory for any transactions involving the funds collected in the fundraiser. (Compl. ¶ 29.)  There are no allegations of any wrongdoing by Bitcoin Suisse in the Complaint.  And Bitcoin Suisse has publicly stated that it is "not aware of any evidence that Contributor funds have been mismanaged, lost or are put at risk by the Tezos Foundation nor any party involved in the project." (Ex. 6.)   Bitcoin also explained that while the "crypto assets" (i.e. the Ether and Bitcoins) have "to a minor extent hedged/liquidated against various fiat currencies at this stage, for the most part [the crypto assets] are still being held by the Tezos Foundation with [Bitcoin Suisse] acting as a mandatory co-signatory service provider." (*Id.*) Bitcoin Suisse reiterated that, "to our current knowledge, no funds have been lost, mismanaged, stolen – nor would it seem they are at risk hereof." (*Id.*)  Thus, Plaintiff's unsupported claim that the Foundation's assets are being "looted" is contradicted by the available evidence.

Similarly, Plaintiff's claim that the "extraordinary volatility of the cryptocurrency market" requires an injunction to prevent any further conversion of crypto-assets into fiat currencies is equally without merit.  Plaintiff claims that this extreme "volatility" requires the Foundation to keep holding Bitcoin and Ether because otherwise "it will make it increasingly difficult for Defendants to provide complete rescission or restitution." (Mot. at 16.)  According to Plaintiff, the value of these extremely "volatile" assets only goes up.  Plaintiff has no idea what the price of Bitcoin or Ether will be in the future, and such rank speculation does not provide any basis to conclude that irreparable harm is

---

[15] *See also* Compl. ¶124 (disavowing "any allegation of fraud, recklessness or intentional misconduct.").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 13 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

likely.[16]  Indeed, Plaintiff cites no law suggesting that converting a highly volatile asset into a more stable asset to hedge against a future downturn constitutes "dissipation of assets."  Rather, like any fiduciary overseeing funds concentrated in a single asset type, the Foundation is acting responsibly by diversifying its portfolio.[17]  Moreover, given that there is no basis for a class-wide injunction, there is no need to enjoin the Foundation from converting all 300,000 ETH to other currencies or assets to ensure that the Foundation can repay the 18 ETH contributed by this Plaintiff.

In addition, Plaintiff's claim that the Foundation might allocate some portion of the proceeds to companies developing applications running on Tezos network does not show irreparable harm.[18]  Funding such companies is consistent with the Foundation's purpose, and it is the best way to ensure the continued success and development of the Tezos network.  This, of course, is precisely what Plaintiff signed up for when he made a contribution to the Tezos project.  This was the very purpose of the fundraiser, which was prominently disclosed before, during, and after the fundraiser.  In any event, Plaintiff cannot allege that spending $50 million of the proceeds, regardless of whether the Foundation diversifies its remaining holdings, would put the Foundation at risk of being unable to return 18 ETH to Plaintiff if his suit is successful. There is no likelihood of irreparable harm to this named Plaintiff.

Finally, the Foundation is under the regulatory authority of the Swiss Supervisory Authority. This means that the Foundation must provide audited financial statements to the Authority, must report its activity to the Authority, including any changes in its board, and that the Authority can step in take action if there is wrongdoing.  Plaintiff has made no allegations, much less presented any evidence, to suggest that the Authority is not adequately protecting the assets in the Foundation's possession.

---

[16] Indeed, according the UBS Wealth Management's Chief Economist Paul Donovan, Bitcoin is in "The bubble to end all bubbles."  Like any bubble, it could burst at anytime. https://www.cnbc.com/2017/12/11/ubs-cryptocurrencies-like-bitcoin-are-the-bubble-to-end-all-bubbles.html

[17] *See generally In re Syncor ERISA Litig.*, 516 F. 3d 1095, 1102-03 (9th Cir. 2008) (denying summary judgment where defendants allegedly held artificially inflated assets in violation of their duty to diversity.)

[18] Further, Plaintiff claims that the Tezos Foundation is sitting on over $1 billion of assets.  Spending $50 million to fund the development of the Tezos network would not cause irreparable harm in such a scenario.  This is especially true where the named Plaintiff only invested roughly 18 ETH.  There is absolutely no suggestion that even if the $50 million is spent that there will not be enough assets to return Plaintiff's contribution if so ordered by the Court.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 14 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

Rather, Plaintiff, with no notice, would have this Court supersede the Swiss regulatory authorities, and freeze the assets of a foreign entity based entirely on Plaintiff's conclusory assertion that "there is reason to believe that Defendants are looting." This does not come close to a showing of likelihood of irreparable harm. *Patterson Vegetable Co., LLC, v. Superior Foods, Inc.*, 2012 WL 5413467 at *4 (N.D. Cal. Nov. 6, 2012) (denying TRO because allegations supporting claim of dissipation of assets are not "supported by any specific facts regarding Defendants, their financial state, or their past behavior that would allow the Court to conclude that" defendants would imminently dissipate trust assets.); *Clouser v. Ion Beam Applications, Inc.*, 2004 WL 540514 (N.D. Cal. March 18, 2004) ("without concrete evidence that [defendant] will soon become insolvent, [plaintiff's] assertions that he will suffer immediate irreparable harm amount to no more than speculation. A finding of irreparable harm must be based on more than speculative assertions." (citing *Goldie's Bookstore v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)); *Malletier v. Sadia*, 2015 WL 7351465 at *6 (N.D. Cal. Nov. 20, 2015) (finding plaintiffs have not established a likely dissipation of assets or irreparable harm because plaintiff's allegation that defendant would move proceeds from a sale overseas is "speculation . . . without factual support.").[19]

### 2. Any Alleged Harm Was Self-Inflicted Because Plaintiff Was Well Aware Of The Characteristics Of XTZ Tokens When He Made His Contribution

Plaintiff cannot claim imminent and irreparable harm where the alleged harm was self-inflicted. *See, e.g., Citizens of the Ebey's Reserve*, 2015 WL 4743847 (W.D. Wash. Aug. 11, 2015) ("a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." (quoting Charles Alan Wright, et al., 11A Fed. Prac. & Proc. § 2948.1 (3d ed.))). When Plaintiff contributed to the fundraiser using Ether and agreed to the Terms, he was well aware that there was no "registration statement" for XTZ Tokens. The Terms plainly state that, "[t]his document does not constitute a prospectus of any sort, is not a solicitation for investment and does not pertain in any way

---

[19] In the rare circumstances where courts grant TROs or preliminary injunctions based on claims related to dissipation of the assets, there is generally concrete evidence of past fraudulent activity and misappropriation of assets or hiding of assets. *In re Focus Media Inc.,* 387 F. 3d 1077, 1086 (9th Cir. 2009) (evidence of past misappropriation of $2 million in corporate assets support finding of irreparable harm and asset freeze); *SEC v. Bar Works Capital, LLC*, 2017 WL 4642311 (N.D. Cal. Oct. 16, 2017) (relying on findings from prior SEC actions that defendants transferred $5 million to off-shore accounts to support finding of irreparable harm and likely dissipation of assets).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 15 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

1   to an offering of securities in any jurisdiction." (Ex. 2 at 1(8).)  Plaintiff's agreement to contractual

2   terms informing him that XTZ tokens are not registered negates any allegation of irreparable harm.

3   Any supposed harm Plaintiff claims he may suffer in the absence of injunctive relief would be entirely

4   self-inflicted, arising from his admittedly well-informed decision to contribute in the absence of a

5   registration statement. *See California Pawnbrokers Ass'n, Inc. v. Carter*, 2016 WL 6599819, at *10

6   (E.D. Cal. Nov. 8, 2016) (alleged harm not irreparable where it "would be due to the [plaintiffs']

7   choice to only extend loans" to certain borrowers).

8                    **3.      Plaintiff's Delay Negates His Claim Of Irreparable Harm**

9           Plaintiff's delay in seeking injunctive relief further undermines his claim of purported

10  imminent harm.  Plaintiff allegedly contributed to the fundraiser in July 2017, and cites to statements

11  from July and August 2017 to support his argument that the fundraised assets will likely be dissipated,

12  (Mot. at 16; Compl. ¶¶ 107, 110), but he waited until December to seek a preliminary injunction.  This

13  weighs against any claim of "imminent" harm. *See, e.g.*, *Aniel v. GMAC Mortg., LLC*, 2012 WL

14  5373388, at *8 (N.D. Cal. Oct. 30, 2012) ("Plaintiffs' unexplained and lengthy [3-month] delay in

15  seeking injunctive relief implies a lack of urgency and irreparable harm and militates against granting

16  the relief requested."); *see also Garcia*, 786 F.3d at 746 (district court did not abuse discretion by

17  finding that months-long delay undercut the plaintiff's claim of irreparable harm); *Lydo Enters. v. City

18  of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a

19  factor to be considered in weighing the propriety of relief.").

20                  **C.      The Balance Of Equities Weighs In Favor Of Defendants**

21          Plaintiff claims that "where a party has obtained funds through fraud" the balance of equities

22  ways in favor of a TRO preventing dissipation of the assets. (TRO at 18:10-17.)  However, there are

23  no allegations of fraud here.  Rather, Plaintiff is just asserting claims under Cal. Corp. Code § 25110

24  and Cal. Bus. & Prof. Code § 17200 for failure to file a registration statement pursuant to the Securities

25  Act of 1933 or otherwise qualify the offering under California law.  Further, Plaintiff cannot make any

26  credible claim that he was misled about whether this was a registered offering.  The Foundation could

27  not have been more clear that this was not a securities offering.

28          Moreover, contrary to Plaintiff's claim, the harm to Defendants by the TRO would not be

Cooley LLP
Attorneys At Law
Palo Alto

- 16 -

Defendant's Opposition to Plaintiff's Ex
Parte Application for TRO
Case No.: 3:17-cv-07095-RS

"limited." Rather, the injunction attempts to prevent the Foundation from spending any money—including any money to fulfill its purpose in promoting the Tezos network. This means that the Foundation could not spend any money to hire developers to finalize the development of the Tezos network. This virtually guarantees that no XYZ tokens will ever be issued, as the tokens cannot be issued until the network is finalized. One plaintiff who contributed a paltry amount to a fundraiser involving roughly 30,000 people now seeks to threaten the entire project by freezing the assets of the Foundation. Such an action is directly contrary to the known wishes of the at least 1,000 plus other contributors who have signed a petition calling on the Foundation to fund the development of the Tezos network. It is especially inequitable where, as here, no class has been certified, the court has not even determined which plaintiff should lead these class action suits, and there is no threat that there would not be enough funds to pay a judgment of Plaintiff's individual contribution.

### D.    A TRO Is Not In The Public Interest

Plaintiff bears the burden of demonstrating that his requested injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). He fails to do so here. Plaintiff claims that the "public interest" factor is neutral where a TRO has "no impact on non-parties." (Mot. at 19:10.) That is not the case here. If the Court issues a TRO freezing all the assets, it will directly affect numerous non-parties that have been working for years to develop the Tezos network. Developers will not be paid by the Foundation. Third-parties who have been working on projects related to the Tezos network will see their efforts go to waste. The Tezos network represents an important advancement in blockchain technology, one that could have numerous applications and benefit society in all sorts of ways. There is no public interest in shutting down a possible revolutionary technology based on such a thin record and where there is no irreparable injury.

### E.    Plaintiff Is Not Likely To Prevail On The Merits

Plaintiff asks this Court to decide a number of novel, complex, and fact-intensive questions on a wholly inadequate record, while simultaneously ignoring the significance of such a determination to the rapidly developing field of crypto-assets. Moreover, he ignores a set of other procedural and contractual hurdles that the Court must address before reaching the substance of his claim. In short, Plaintiff has not and cannot establish that he is likely to prevail on the merits of his claim. His request

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 17 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

for a TRO on this record is inappropriate, if not absurd, and should be denied.

### 1. Plaintiff Has Not Shown The Tezos Fundraiser Was An "Offer And Sale Of Securities"

Plaintiff has not come close to showing that the Tezos fundraiser constituted an "offer and sale of securities." (Mot. at 10-13.)  He relies solely on a novel and highly contested application of the *Howey* test, which was conceived long before the invention of computers, let alone the creation of the decentralized ledger (a technology as transformational as the internet itself).  That test cannot be reliably applied at this time because it requires a far more developed record than is before the Court. As Plaintiff well knows, the *Howey* test is a fact-intensive inquiry that the SEC has stated depends upon "the particular facts and circumstances" of a given case and requires considering "all of the relevant facts and circumstances."  *SEC v. W.J. Howey Co.,* 328 U.S. 293, 297-300 (1946) (detailed factual analysis of putative investment contract "under the circumstances"), SEC Release No. 81207, DAO Report, (July 25, 2017) at 10 ("[T]he U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances."); *In the Matter of Munchee Inc.,* Release No. 10445 (Dec. 11, 2017) at 9 ("All of the relevant facts and circumstances are considered in [analyzing putative investment contracts.]"); *see also Trachsel v. Buchholz,* 2009 WL 839117, at *5 (N.D. Cal. Mar. 30, 2009) ("The determination of whether a particular instrument constitutes a security under Cal. Corp. Code § 25019 . . . must be made on an ad hoc basis upon a review of the surrounding facts and circumstances[.]").  The current record is far too thin to support this type of fact-intensive inquiry, particularly where the issue raised is a matter of first impression: no court has ever ruled in favor of a private plaintiff's claim that a token that fuels a decentralized blockchain is a security.[20]  For example, bitcoin, which was created nearly a decade ago, is considered a type of currency or commodity, rather than a security.  *See SEC v. Shavers,* 2013 WL

---

[20] Cases brought by the SEC are distinguishable.  For example, in *SEC v. Plexcorps*, the court recognized that the SEC need not prove the elements of the rigid preliminary injunction standard because "preliminary injunctions in lawsuits brought by the Commission are 'creatures of statute' and not 'rooted wholly in the equity jurisdiction of the federal court.'" *See* Plaintiff's Statement of Recent Decision (Dkt 11-1 at 2.).  In addition, in *Plexcorps*, the SEC brought claims sounding in fraud under Section 10(b) of the Exchange Act, unlike here where Plaintiff disavows all allegations of fraud, recklessness or intentional misconduct.") *See id.; see also* Compl. ¶124; *SEC v. Shavers*, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) (analyzing whether bitcoin is a security for purposes of subject matter jurisdiction).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

4028182 (E.D. Tex. Aug. 6, 2013) ("Bitcoin can be used as money."); *Coinflip, Inc., d/b/a Derivabit and Francisco Riordan*, CFTC Docket No. 15-29 (Sept. 17, 2015) ("Virtual currencies such as bitcoin are commodities").  Indeed, Plaintiff concedes that Bitcoin and Ethereum are virtual currencies and makes no allegations that they should be treated as securities, yet asks this Court to treat XTZ differently based on nothing more than the allegations in his Complaint.  (*See e.g.*, Compl. ¶ 39.)  The Court should decline the invitation.

Not surprisingly, courts that have applied the *Howey* test to determine whether investment contracts are securities in other contexts have come out a variety of ways for a variety of reasons depending on the context.  *See, e.g., United Housing Found. v. Forman*, 421 U.S. 837 (1975) (investment contract not a security because investors "were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments"); *Noa v. Key Futures, Inc.*, 638 F. 2d 77 (9th Cir. 1980) (investment contract not a security because "the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [defendants]"); *see also SEC v. Belmont Reid & Co. Inc.*, 794 F. 2d 1388 (9th Cir. 1986) (same); *Sinva v. Meriill, Lynch, Pierce, Fenner & Smith Inc.*, 253 F. Supp. 359 (1966) (S.D.N.Y. 1966) (investment contract not a security because "the element of future delivery does not transform a commodities contract into a securities contract").

"[O]n application for [a TRO] the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact."  *Arthur J. Gallagher, & Co. v. Edgewood Partners Ins. Ct*r., 2008 WL 205274, at *1 (N.D. Cal. Jan. 23, 2008) (quoting *Dymo Indus., Inc. v. Tapeprinter, Inc*., 326 F.2d 141, 143 (9th Cir. 1964)).  Though Plaintiff asks this Court to do both on an impossibly slim record, the Court need not and should not do so.

### 2.    Plaintiff Cannot Proceed With This Action

Plaintiff also cannot establish that he is likely to prevail on the merits of his action because he ignores a number of procedural and contractual issues that preclude his success, separate and apart from the question of whether Defendants "offered and sold securities."

***Choice of Forum***: The Terms also contain a forum selection clause that prevents any court other than "the ordinary courts of Zug, Switzerland" from adjudicating Plaintiff's claims.  (Ex. 2 at

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 19 -

DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX
PARTE APPLICATION FOR TRO
CASE NO.: 3:17-CV-07095-RS

10(48) ("Any dispute arising out of or in connection with the creation of the XTZ and the development and execution of the Tezos Network shall be exclusively and finally settled by the ordinary courts of Zug, Switzerland.").)  The parties' prior agreement on this issue is particularly critical, as the Tezos Foundation—the entity that holds title to the disputed assets—is based in Zug, Switzerland.  As the parties have already agreed on the proper forum for this suit, it may not go forward in this Court.  *See, e.g., Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texa*s, 134 S. Ct. 568, 581 (2013) ("The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system.") (citation omitted); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) (forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances").

*Choice of Law*:  Similarly, the Terms contain a choice of law provision stating that Swiss law governs this dispute.  (Ex. 2 at 10(48) ("The applicable law is Swiss law.").)  Even if this case could be heard in this Court, Plaintiff has failed to demonstrate likely success on the merits based on Swiss law.  *Cf. Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247, 269-70 (2010). (affirming limitation on extraterritorial application of federal securities law in order to avoid "interference with foreign securities regulation," among other things).

In sum, there are simply no grounds on which this Court could find that Plaintiff has established a likelihood of success on the merits.  The relief Plaintiff seeks is "extraordinary" under any circumstances, and doubly so here.  Granting such relief would require this Court to address fact-intensive, controversial questions of first impression on the thinnest of records, in a forum and under law that contradict the parties' contractual agreement, and on behalf of a putative class that is yet to be certified.  His request for a TRO should be denied.

## V.    CONCLUSION

For the foregoing reasons, DLS respectfully requests that the Court deny Plaintiff's request for a TRO.

1  Dated:  December 15, 2017                COOLEY LLP

2

3                                           */s/ Patrick Gibbs*
                                            Patrick E. Gibbs ((183174)
4                                           Attorneys for Defendant
                                            DYNAMIC LEDGER SOLUTIONS, INC., a
5                                           Delaware corporation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- 21 -