UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRUCE MACDONALD,

Plaintiff,

v.

DYNAMIC LEDGER SOLUTIONS, INC.,
et al.,

Defendants.

Case No. 17-cv-07095-RS

**ORDER DENYING APPLICATION FOR
TEMPORARY RESTRAINING ORDER**

## I. INTRODUCTION

California resident Bruce MacDonald brings this putative class action on behalf of all
persons who contributed to the Tezos Initial Coin Offering ("ICO") in July 2017. MacDonald
alleges defendants participated in an illegal sale of unqualified securities in violation of
California's Corporate Securities Law of 1968 (Cal. Corp. Code § 25110) and California's Unfair
Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*). He seeks a temporary restraining order
enjoining defendants[1] from selling, transferring, converting, or otherwise disposing of any assets
collected or derived from the ICO in advance of the preliminary injunction hearing scheduled for
January 11, 2018 in related case *Okusko v. Dynamic Ledger Solutions, Inc. et al.*, Case No. 3:17-
cv-06829. Because plaintiff has failed to show that he is likely to suffer irreparable harm in the
absence of injunctive relief, his application is denied.

---

[1] Dynamic Ledger Solutions, Inc., Tezos Stiftung (the "Tezos Foundation"), Kathleen Breitman,
Arthur Breitman, Timothy Cook Draper, Draper Associates, Johann Gevers, Diego Ponz, Guido
Schmitz-Krummacher, Bitcoin Suisse AG, and Niklas Nikolajsen.

United States District Court
Northern District of California

# II. BACKGROUND[2]

The Tezos project was originally conceived of by Defendants Arthur and Kathleen Breitman. In 2014, Mr. Breitman released a White Paper touting Tezos as a "self-amending crypto-ledger." He soon after authored an associated business plan. In 2015, Mr. Breitman created and incorporated Dynamic Ledger Solutions Inc. ("DLS") in Delaware to develop Tezos, listing himself as chief executive. Since its incorporation, DLS has principally operated out of the Breitman's home in Mountain View, California. The company was initially funded through a pre-sale that garnered $612,000 from ten early backers that included hedge funds and high net-worth individuals. Around May 2017, however, DLS began to run out of funding.

The Breitmans reached out to Defendant Tim Draper who, via his firm Draper Associates, invested $1.5 million in the project and took a minority stake in DLS. Around the same time, the Tezos Foundation was formed as an independent non-profit foundation in Zug, Switzerland. The Foundation was to serve as the recipient of ICO funds and to help promote the development and use of the Tezos blockchain. DLS, however, retained control of the Tezos source code and other intellectual property. Defendants Gevers, Ponz, and Schmitz-Krummacher were named as the Foundation's directors.

The Tezos ICO itself began in July of 2017 and lasted about two weeks. It was "uncapped" which meant there was no limit on the amount of payments accepted. Ultimately the ICO collected 65,627 Bitcoin and 361,122 Ethereum, including 18.145 Ethereum from Plaintiff MacDonald. At the time, the combined value of those cryptocurrencies was approximately $232 million USD. Today, they are valued at more than $1 billion USD.

In August 2017, the Foundation stated it had been slowly converting assets obtained through the ICO into cash at a pace of roughly $500,000 USD per day. It also announced it had

---

[2] In evaluating an application for a TRO, the allegations in the complaint are taken as true. *Hughes v. Wells Fargo Bank, N.A.*, 2009 WL 5174987 at *1 (D. Ariz. Dec. 18, 2009).

committed $50 million USD in ICO proceeds to fund companies looking to build on the Tezos platform.

In October 2017, an attorney for the Breitmans sent a 46-page letter to Defendants Ponz, and Schmitz-Krummacher, calling for Defendant Gevers' prompt removal from the Foundation's board and accusing Gevers of self-dealing, self-promotion, and conflicts of interest. The letter alleged that Gevers had been improperly enriching himself through an unjustified seven-figure "bonus." Gevers responded by calling the accusations character assassination and accusing the other board members of an "illegal coup." The Tezos Foundation promised an audit of the ICO proceeds would be published in November 2017 but no such audit has been released. Most recently, on December 12, 2017, Reuters reported Schmitz-Krummacher had resigned from the Foundation's board and that Gevers would nominate his replacement.

The instant action was filed on December 13, 2017. It is the fourth filed case before this court involving the Tezos ICO.[3] One of the related cases, *Okusko v. Dynamic Ledger Solutions, Inc. et al*, Case No. 17-cv-6829, has a preliminary injunction hearing set for January 11, 2018.

### III. LEGAL STANDARD

A request for a temporary restraining order is evaluated by the same factors that generally apply to a preliminary injunction. *See Stuhlbarg Int'l. Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). Thus, as a form of preliminary injunctive relief, a TRO is an "extraordinary remedy" that is "never granted as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

To obtain preliminary relief, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 21-22.

---

[3] The first, *GGCC, LLC v. Dynamic Ledger Solutions, Inc. et al*, Case No. 17-cv-6779, was filed on November 26, 2017. The second, *Okusko v. Dynamic Ledger Solutions, Inc. et al*, Case No. 17-cv-6829, was filed on November 28, 2017. The third, *Baker v. Dynamic Ledger Solutions, Inc. et al*, Case No. 17-cv-6850, was filed on November 29, 2017.

The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, under the sliding scale test, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id.* at 1135.

## IV. DISCUSSION

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "[E]conomic injury alone" is insufficient "because such injury can be remedied by a damage award." *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991). Moreover, the mere "possibility" of irreparable harm or of a "speculative injury" is not enough to justify injunctive relief. *See Winter*, 555 U.S. at 22*; In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Such extraordinary relief is only appropriate where the threat of harm is "immediate." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988).

More specifically, to justify an asset freeze of the sort sought here, the party seeking relief "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). In determining whether a freeze is appropriate, courts in the Ninth Circuit have looked to evidence that defendants are in the process of dissipating assets, are strategizing to do so in the future, or have a history of past financial misconduct. *See, e.g. Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (affirming district court that expressly found it "was not only possible, but probable" defendant would dissipate assets based on her past history of fraudulent intra-family transfers, concealment of assets in defiance of a court order, and a conveniently timed divorce settlement.); *Johnson*, 572 F.3d at 1085 (past financial misconduct

1    showed defendant was "more than capable of placing assets in his personal possession beyond the

2    reach of judgment.")

3          Here, MacDonald seeks an injunction preventing the defendants from spending,

4    converting, or dissipating the cryptocurrency assets acquired through the Tezos ICO. He argues

5    that in the absence of a TRO, he, and the class members he purports to represent, will suffer

6    irreparable harm from defendants looting or converting the cryptocurrency assets acquired in the

7    ICO. In support of this argument, MacDonald alleges: 1) there have been very few updates about

8    the project despite investors having been told it would be launched by now; 2) there has been no

9    delivery of the promised tokens; 3) there is evidence of infighting amongst Tezos leadership

10   including accusations that Board Member Gevers has engaged in self-dealing, self-promotion and

11   conflicts of interest; 4) the Foundation promised an audit would be published in November but

12   recently fired its auditor; 5) the defendants have taken steps to convert the cryptocurrencies

13   received in the ICO into fiat currency (at an approximate rate of $500,000 USD each day); and 6)

14   the defendants have stated they intend to use $50 million USD of the ICO proceeds to invest in

15   companies looking to build on the Tezos platform.

16          Unfortunately for MacDonald, the facts alleged are not enough to suggest an immediate

17   risk of irreparable harm. First, as a threshold matter, it is not clear that damages would be

18   inadequate to compensate MacDonald for any harm he suffers. While it is true that California

19   Civil Code § 25503 offers rescission as a potential remedy, it also provides that, "if the

20   consideration given for the security is not capable of being returned," then the plaintiff may

21   recover damages.

22          MacDonald attempts to dodge this argument by noting the volatility of the cryptocurrency

23   market. The Bitcoin and Ethereum he and others contributed during the Tezos ICO has since

24   ballooned in value.[4] If the defendants are permitted to convert those cryptocurrencies into cash,

25   and the cryptocurrencies continue to increase in value, it is possible, MacDonald argues, that

26

27   _____
     [4] What was worth $232 million in July is now worth over $1 billion.

28

United States District Court
Northern District of California

defendants will not be able to afford to buy back the Bitcoin and Ethereum (or provide the equivalent monetary damages) to which plaintiff and the class would be entitled if they prevail. It is far from certain, however, that the value of Bitcoin and Ethereum will continue to rise. Nor does it seem inherently irresponsible or suspect that the Tezos Foundation would convert some of these highly volatile assets into a more diverse and stable portfolio.

Moreover, MacDonald's allegations of looting simply do not have enough behind them. The lack of updates regarding the project, the infighting amongst Tezos leadership, the firing of an auditor, and the delayed launch of the project are all worrisome. None of them, however, are strong evidence of looting. The funding of companies working to develop the Tezos network seems consistent with the Foundation's purpose (and the success of the enterprise as a whole). The conversion of some portion of the volatile cryptocurrency assets into more stable currency is unlikely to jeopardize MacDonald's ability to recover the 18.145 Ethereum he contributed (or its equivalent economic value) should he ultimately prevail. Additionally, plaintiff's allegations that a TRO is necessary to prevent the cryptocurrency assets from being dissipated in their entirety and on short notice is undercut by MacDonald's acknowledgement that there are procedures in place to make the rapid movement of ICO assets difficult. Specifically, Bitcoin Suisse is a mandatory co-signatory for any transactions involving the funds collected in the ICO. Bitcoin Suisse has publicly stated it is not aware of any evidence of funds being mismanaged and MacDonald has not alleged any wrongdoing by Bitcoin Suisse.[5]

On the whole, MacDonald fails to show that the defendants are in the process of dissipating assets, are strategizing to do so, or have a history of past financial misconduct. As a result, his concerns about dissipation rise to little more than speculation. They are not sufficient to

---

[5] Relatedly, a declaration submitted by plaintiffs (documenting comments made in an online forum by an individual claiming to be Defendant Schmitz-Krummacher) suggests that even if defendants wanted to convert large amounts of cryptocurrency into fiat currency rapidly it would be difficult to do so due to reluctance by Swiss banks to conduct such transactions.

support a finding of irreparable harm and therefore do not justify the "extraordinary remedy" of issuing injunctive relief.

Because plaintiff has failed to show he is likely to suffer irreparable harm, his other arguments—regarding success on the merits and whether the balance of equities and the public interest favor injunctive relief—need not be reached.

### V. CONCLUSION

Plaintiff MacDonald's application for a temporary restraining order is denied.

**IT IS SO ORDERED**.

Dated: December 20, 2017

_____
RICHARD SEEBORG
United States District Judge