Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
BRUCE MACDONALD,            )
                            )
           Plaintiff,       )
                            )
   VS.                      )    NO. C 17-07095 RS
                            )
DYNAMIC LEDGER SOLUTIONS,   )
INC., et al.,               )
                            )
           Defendants.      )
_____)
```

San Francisco, California
Tuesday, December 19, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        BLOCK & LEVITON, LLP
                        155 Federal Street, Ste. 400
                        Boston, MA 02110
                BY:  **JAYNE E. FLEMING**
                     **ATTORNEY AT LAW**


For Defendant Dynamic Ledger Solutions, Inc.:

                        COOLEY GODWARD
                        3175 Hanover Street
                        Palo Alto, California  94304
                BY:  **PATRICK EDWARD GIBBS**
                     **SAMANTHA ANNE KIRBY**
                     **JEFFREY M. KABAN**
                     **ATTORNEYS AT LAW**




Reported By:     Rhonda L. Aquilina, CSR #9956, RMR, CRR
                 Official Court Reporter

**APPEARANCES:   (CONTINUED):**

For Plaintiffs:

                     LEVI KORSINKY, LLP
                     1101 30th Street, NW, Ste. 115
                     Washington, D.C. 20007
           BY:  **DONALD J. ENRIGHT**
                **ATTORNEY AT LAW**

                     LEVI & KORSINKY, LLP
                     49 Montgomery Street, Ste. 605
                     San Francisco, CA 94104
           BY:  **QUENTIN ROBERTS**
                **ATTORNEY AT LAW**

                     HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
                     715 Hearst Avenue, Ste. 202
                     Berkeley, CA 94710
           BY:  **DANIELLE CHARLES**
                **ATTORNEY AT LAW**

For Defendant Tezos Foundation:

                     DAVIS, POLK & WARDWELL LLP
                     1600 El Camino Real
                     Menlo Park, California  94025
           BY:  **NEAL A. POTISCHMAN, ATTORNEY AT LAW**
                **EDMUND POLUBINSKI, III**
                **SERGE VORONOV**
                **ATTORNEYS AT LAW**

For Defendant Timothy Draper and Draper Associates, LP:

                     MANATT, PHELPS & PHILLIPS, LLP
                     One Embarcadero Center 30th Floor
                     San Francisco, CA 94111
           BY:  **CHRISTOPER L. WANGER**
                **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Tuesday - December 19, 2017**                    **10:00 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 |     **THE CLERK:**  Calling case C 17-7095, Bruce MacDonald |
| 5 | versus Dynamic Ledger Solutions. |
| 6 |    Counsel, please come forward and state your appearances. |
| 7 |      **MR. FLEMING:**  Good morning, Your Honor.  Joel Fleming, |
| 8 | Block & Leviton, for plaintiff Bruce MacDonald. |
| 9 |      **THE COURT:**  Good morning. |
| 10 |      **MS. CHARLES:**  Good morning, Your Honor.  Danielle |
| 11 | Charles from Hagens, Berman, Sobol, Shapiro. |
| 12 |      **THE COURT:**  Good morning. |
| 13 |      **MR. WALKER:**   Jacob Walker also from Block & Leviton |
| 14 | for Bruce MacDonald. |
| 15 |      **THE COURT:**  Good morning. |
| 16 |      **MR. ROBERTS:**  Good morning, Your Honor.  Quentin |
| 17 | Roberts on behalf of plaintiff Okusko, Okusko from Levi & |
| 18 | Korsinsky. |
| 19 |      **THE COURT:**  Good morning. |
| 20 |      **MR. ENRIGHT:**  Your Honor, Donald Enright of Levi |
| 21 | Korsinsky here on behalf of plaintiff Andrew Okusko.  I'll note |
| 22 | that we don't actually have a motion -- |
| 23 |      **THE COURT:**  Who is this? |
| 24 |      **MR. ENRIGHT:**  Plaintiff Okusko is the related action |
| 25 | that has been set for a PI hearing in front of Your Honor. |

1          **THE COURT:**  Oh, okay.

2          **MR. POTISCHMAN:**  And good morning, Your Honor.  Neal

3    Potischman from Davis Polk on behalf of Defendant Tezos

4    Foundation.

5          With me from Davis Polk is Serge Vornov.  And with Your

6    Honor's permission, my partner Ted Polubinski, who has not been

7    admitted pro hac vice, but who will be seeking admission

8    shortly.

9          **THE COURT:**  Very well.  Good morning.

10         **MR. GIBBS:**  Good morning, Your Honor.  Patrick Gibbs

11   from Cooley on behalf of Dynamic Ledger Solutions.  And with me

12   at counsel table are my colleagues Jeffrey Kaban and Samantha

13   Kirby, also from Cooley.

14         **THE COURT:**  Good morning.

15         **MR. WANGER:**  Good morning, Your Honor.  Chris Wanger

16   from Manatt, Phelps for Timothy Draper and Draper Associates,

17   LP.

18         **THE COURT:**  Good morning.  Okay.  Well, this matter is

19   on for a motion for a TRO.

20         I have read the papers, to the extent they've come in.

21   This is no longer an ex parte application, because I required

22   notice, so it's now an application for a temporary retraining

23   order.

24         So who on the plaintiffs' side is going to begin the

25   discussion?

1          **MR. FLEMING:**  I'll be speaking for plaintiffs, Your

2   Honor.  And the Court did ask us in the order to meet and

3   confer to see whether this was something that could be resolved

4   short of a court order.  We did have those discussions.

5          **THE COURT:**  Good.

6          **MR. FLEMING:**  I would characterize them as relatively

7   productive.  And Mr. Potischman may have more to add on this.

8   I will say that there's probably broad agreement on concepts

9   that we might be able to get something done to sort of hold

10   things in place until the Court could hear a preliminary

11   injunction motion on a somewhat more normal schedule.  We would

12   be seeking discovery.  They may have a different view on that.

13          I think the sticking point is the jurisdictional question.

14   My understanding -- and again, my colleague may be able to

15   offer more colors -- that there are some issues of Swiss law

16   that make it difficult for Swiss Foundation to which -- you

17   know, doesn't concede this Court's jurisdiction, to consent to

18   that for purposes of entering a stipulation.

19          So I think that's where we are.  We did make some

20   progress.  If the Court does enter -- grant the application

21   today and enter an order, but has concerns about sort of

22   impeding the ongoing progress of the company, I do think that

23   we would be able to work out some language that could address

24   that, but that's sort of where we are.

25          **THE COURT:**  You know, there is a preliminary

 1  injunction hearing that I do have currently scheduled in this

 2  related matter in January.

 3       **MR. FLEMING:**  I do know that, and I plan to address

 4  that a bit later.

 5       I will say now that the defendants are not all the same.

 6  So I think there's a question about whether the relief being

 7  sought in the other preliminary injunction motion is

 8  necessarily going to be adequate for what we're seeking.

 9       The other injunction -- the other action is also brought

10  under the Federal Securities laws, and so it's subject to the

11  PSLRA, and so I think there are some additional hurdles in

12  terms of discovery in that action that are not presented by our

13  case, which is brought under California law.  So I think we

14  would want our own briefing on that.  It would probably be

15  efficient to set that hearing at the same time, but I --

16       **THE COURT:**  That's very likely.

17       **MR. FLEMING:**  From our perspective, I don't think that

18  our view is that the Okusko motion is not -- would not provide

19  complete relief of the type that we're seeking, so --

20       **THE COURT:**  Okay.  Let me ask you right at the outset,

21  your client, as I understand it, invested, donated, whatever

22  term we want to use here, $5,000, the equivalent of $5,000 in

23  value.

24       **MR. FLEMING:**  In theory, yeah.

25       **THE COURT:**  Why should you be in the position to ask

1  for a TRO when you're not Class counsel?  We haven't gone

2  through that whole process.  There is no Class yet at the

3  moment.

4      At the absolute maximum possible additional value that you

5  could experience, there's no real question that there wouldn't

6  be satisfactory funds to take care of Mr. MacDonald, so why are

7  you here for a TRO?

8          **MR. FLEMING:**  Yeah, that's a great question, and I

9  think it's clearly the sort of --

10          **THE COURT:**  Thank you.

11          **MR. FLEMING:**  -- lead argument, lead argument that --

12  all the Court's questions are good.  That's clearly the lead

13  argument the DLS leads off on.  And it wasn't addressed perhaps

14  as thoroughly as it should have been in our papers.

15      I will say that just reading the cases that are cited in

16  the DLS papers, though, I think you can see why the *Zepeda*

17  action, which is this idea that it's sometimes inappropriate to

18  grant class-wide injunction prior to certification, I don't

19  think it applies here.  And there are a couple of reasons.

20      First, in the *Bresgal* case, which is cited in DLS's

21  papers, it talks about what *Zepeda* means, and it says that the

22  rule underlying *Zepeda* is that an injunction cannot issue

23  against an entity that is not a party to the suit.

24      Here, the only parties that we're asking to be enjoined

25  are parties who are before this Court.  They may dispute

1    service or jurisdiction, but they are before this Court.   And

2    *Zepeda* was enjoining a --

3              **THE COURT:**   That's focusing more on the defendants.

4              **MR. FLEMING:**   That's right.

5              **THE COURT:**   I'm focusing on the plaintiffs.   Why are

6    you in a position -- I'm not suggesting that you or your client

7    are not fine people -- but why should you be entitled to get a

8    TRO at this point, whereas other participants might be in a

9    better position to get that if they had -- this effectively, in

10   a sense, goes to irreparable injury.   I mean, I just don't

11   understand why, even if you are completely right on the merits

12   and the various other factors we have to go through for a TRO,

13   at most the value of your -- as my law clerk calculated for

14   me -- the value would be something like $18,000.   They're good

15   for it.   Maybe it will even go up a lot more between now and

16   January.   But how can you be in the position to say that unless

17   we, you know, put a halt on everything, your particular client

18   is at risk?

19             **MR. FLEMING:**   I think my client genuinely is at risk.

20   And I think defendants' assumption is that there will be, you

21   know, at least $18,000 left over at the end of the day, and

22   that's undoubtedly true.   I don't think it's true, though, that

23   if, at the end of the day, there's less than a full pot for all

24   the plaintiffs, that our guy is going to be able to get

25   everything for himself.   I think at the point that if the value

1    of these things does crash, obviously, you know, the SEC has

2    been, as we cite, cracking down on a number of ICOs.

3        If at some point, prior to getting final relief in this

4    case, there is a dramatic decline and value of those assets do

5    disappear, entities might be pushed into bankruptcy

6    proceedings, reorganization proceedings, whatever the

7    equivalent would be under Swiss law.  And so I don't think that

8    it is necessarily an accurate assumption that our plaintiff and

9    our plaintiff alone would be able to get a hundred cents on the

10   dollar.

11       **THE COURT:**  The question that's underlying all of

12   this, which is an interesting question, is when I'm analyzing

13   it on the irreparable injury prong, are you asking me -- are

14   you saying that you are entitled to speak for all of the

15   investors/donators, and that when I'm making a value assessment

16   to determine, as you say, what's at risk and what isn't, and

17   the immediacy of all this, we have just been talking, and

18   you've been focusing on, well, even my own particular clients'

19   share of this pie here is enough, and that's one possible

20   argument.

21       I thought the argument you were going to be making is that

22   even though you're not Class counsel at this point, that

23   somehow you can speak for the entire group, and that's what I'm

24   trying to ask.

25       **MR. FLEMING:**  And that is also --

1          **THE COURT:**  Why?

2          **MR. FLEMING:**  That is also our argument, because it's

3    a putative class, and we will be seeking class relief.  There's

4    simply not time to go through the entire class certification.

5          **THE COURT:**  Well, but you've got counterparts already

6    at the table who are saying we are the ones who should be, at

7    the end of the day, or will be Class Counsel.

8          So why -- I'm looking for the law that says at this

9    incredibly early stage of this proceeding, and someone moves

10   forward because they've decided they want to file a TRO, why --

11   is it simply because you were the one that filed the TRO that I

12   can say you're Putative Class -- Interim Class Counsel before

13   we get any further?  I mean, what is the procedural requirement

14   as to who I can look to in this situation?

15         **MR. FLEMING:**  I don't think you need to find that

16   we're Interim Class Counsel or resolve the leadership questions

17   yet, because the relief that's being sought is, in terms of

18   duration, very, very short.  And so if at some point someone is

19   appointed Class Counsel, and there's a question about whether

20   there might be separate Class Counsel for people asserting

21   securities claims -- federal securities claims versus other

22   claims.  So I don't think the Court needs to reach that

23   question.  I think we're seeking relief to sort of preserve the

24   status quo for a relatively narrow period of time while these

25   preliminary --

1        **THE COURT:**  I understand, but I'm still trying to find

2   or ask for some guidance on what law says I can look at this

3   moment in time beyond the irreparable injury that your

4   particular client is going to shoulder.

5        And I, you know, I think you made a valiant effort, but at

6   the end of the day, even if everything collapsed and you were

7   in Swiss bankruptcy court, you're probably going to get the

8   $18,000.  I mean, you file your claim, you get $18,000, because

9   there's an enormous amount of funds, apparently, that have been

10  invested into this operation, this Foundation, or they're

11  holding the funds, as I understand it, in Switzerland.  So if

12  we look at it just through the prism of your particular client,

13  it's pretty hard to say there's irreparable injury.

14       **MR. FLEMING:**  That's right.  And I do think there's

15  authority for looking at it from the perspective of the Class.

16       And this isn't in our papers, but we weren't given the

17  opportunity to file a reply, so I direct the Court -- it's a

18  2012, and it's an unpublished opinion by the Ninth Circuit, but

19  it's after 2007, so I think the Court can treat it as

20  persuasive.  It's the *Just Film, Inc. versus Merchant Services,*

21  *Inc.* decision, 474 Federal Appendix 493, at 495, 2012 decision

22  by the Ninth Circuit affirming Judge Wilken, and holding that

23  the district court:

24       (Reading) Did not abuse its discretion by finding

25        sufficient evidence to support its preliminary injunction,

1        which was carefully tailored to maintain the status quo

2        where Class Certification is pending, has not been

3        decided, and the plaintiff has shown that a class-wide

4        injunction is necessary to remedy the alleged class-wide

5        harm, which we do allege here.

6            **THE COURT:**  Of course a preliminary injunction is a

7    different animal than a TRO.

8            **MR. FLEMING:**  It is, and this is intended as --

9            **THE COURT:**  They're related, but --

10           **MR. FLEMING:**  They're related, and this is intended as

11   a bridge, as a more modest form of preliminary relief to get us

12   to the point where we can brief a preliminary injunction.

13       The Ninth Circuit goes on to say:

14       "We do not read *Zepeda* to preclude our result, because

15       in *Zepeda* the trial court had denied Class Certification,

16       and here the trial court has not yet decided the Class

17       Certification issue."

18       I do have a copy, which I'll share with defense counsel.

19   And I can pass up a copy as well.

20           **THE COURT:**  Okay.  Can you shift for me now to some of

21   these jurisdictional questions that seem to be fairly

22   substantial?  I understand there's -- DLS is California, but

23   I'll hear from them later, but they filed a supplemental

24   declaration saying we don't have any control over these funds.

25   And we've got certain individuals that are going to be -- or

```
1    Californians, and you've got jurisdiction over them.  But how

2    about the Swiss entity?  Why is there any jurisdiction over

3    them?

4             MR. FLEMING:  Sure.  So there's -- and I think there

5    are a couple sort of international questions, jurisdictional,

6    choice of law, choice of forum.  I'll start with the personal

7    jurisdiction question.

8        There's jurisdiction over the Swiss entities, because they

9    engaged in the sale of unregistered securities.  First to a

10   California resident, our plaintiff, and others like him, there

11   are undoubtedly other --

12            THE COURT:  They don't do any selling at all.  They're

13   the holders of the funds, according to --

14            MR. FLEMING:  That's fair.  And the true seller, as

15   part of an enterprise -- and from our perspective, and I think

16   that's right -- the true seller or issuer of DLS, which holds

17   the source code for the technology, the actual blockchain

18   technology that the Tezos token, which is the security that

19   will be issued to plaintiff and Class Members, that's a

20   California company.

21       So this is -- they're participating in essentially an

22   offering of securities by a California headquartered company,

23   and in our papers we cite the Ninth Circuit's decision in

24   *Davis*.

25            And in *Davis* --
```

1          **THE COURT:**  Well, are you saying that they then are in

2    a position to direct the Swiss entity as to what to do?

3          **MR. FLEMING:**  The DLS is in a position to?

4          **THE COURT:**  Right.

5          **MR. FLEMING:**  Not necessarily with the funds, but the

6    Foundation at the time of the ICO, prior to the sort of dispute

7    that has brought us here -- and to be clear, the dispute I

8    don't think forms the basis of our actual claim on the merits,

9    but it's why we think there's irreparable harm.

10         At the time of the ICO, the Foundation and DLS are working

11   sort of hand-in-glove together to do this issuance.  The

12   Foundation is receiving and holding the funds, but the actual

13   issuance, the securities that are going to Class Members are

14   the tokens on the blockchain, and that's held right now by DLS,

15   which is a California company.  So I think that gives the Court

16   specific personal jurisdictions.

17         And, again, I cite to the *Davis* case.  There, these are

18   out-of-state officers and directors of a corporation

19   headquartered in Arizona who were sued under the Arizona

20   Securities Act, which has sort of similar language to the

21   Federal Securities Act, are the liability for people who sign a

22   registration statement.  And the Court held, *well, you signed a*

23   *registration statement, participated in the offering* --

24         **THE COURT:**  Well, I don't -- I don't think there's a

25   whole lot of problem jurisdictionally over DLS.  Their issue

1  seems to be more sort of you can enjoin us, but we're not the

2  party that's, you know, got the control.

3      My concern -- you're bootstrapping the DLS-Tezos

4  Foundation relationship and saying that sweeps the Swiss entity

5  into this Court and allows me to exert jurisdiction over them,

6  and it's that link in the chain that I'm not clear on.

7          **MR. FLEMING:**  I agree.  And so I think the Foundation

8  is similarly situated to the sort of outside directors in the

9  *Davis* case.  These weren't Arizona residents.  These were

10  people who were participating in an offering by an Arizona

11  company.  And the Court -- and the Ninth Circuit --

12          **THE COURT:**  They were the directors of the Arizona

13  company.

14          **MR. FLEMING:**  That's correct.  But here, again, the

15  Foundation has no meaning or purpose other than its

16  relationship to DLS and the Tezos technology.  It didn't exist

17  prior to the Breitmans deciding that this was the structure

18  they were going to do in order to raise the money for the

19  operations of DLS developing the Tezos technology.

20          **THE COURT:**  At a certain point it doesn't appear to be

21  disputed, even from these preliminary papers, that they jumped

22  through the hoops and organized a Swiss entity under Swiss law.

23          **MR. FLEMING:**  It is organized under Swiss law, but you

24  can have -- so, for example, imagine Delaware certainly has

25  jurisdiction over someone who is a controlling shareholder of a

1   Delaware corporation who may be existing abroad.  These are

2   sort of novel structures that don't comport with the usual

3   situation.

4        But I think you certainly can't have someone who is a

5   controlling person of a California corporation who might be in

6   another state or in another country who is nonetheless subject

7   to the jurisdiction of California courts.  And I think that's

8   what you have here.  Because if they had done this properly,

9   and if they had issued a registration statement, the Foundation

10  would have been signing things and affirming things as part of

11  that registration statement.  And under *Davis* that would have

12  clearly brought them within the scope of the Court's specific

13  personal jurisdiction.

14       Here, their argument is essentially -- if you look at

15  page -- let me just find the page of their brief.  If you look

16  at page 5 of the Foundation's opposition, the way they

17  distinguish *Davis*, and the cases like it that we cite where

18  courts have held that foreign defendants targeted a U.S.

19  jurisdiction by participating in an offering, their distinction

20  is the ones that even concern foreign entities involve those

21  entities having actually made filings with the U.S. Securities

22  and Exchange Commission voluntarily subjecting themselves to

23  U.S. jurisdiction.  I think that proves too much.

24       The argument is*: Well, we declined to file documents

25  required by the U.S. securities laws, therefore we can't be*

1   *subject to the U.S. securities laws*.  I think it's circular,

2   and I don't think that the securities laws are so narrow that

3   they wouldn't reach someone who is participating in an

4   unregistered security where the securities are being issued by

5   a California company, DLS.

6       I do think that the Court has specific personal

7   jurisdiction over someone in that situation.

8           **THE COURT:**  Okay.  Why don't you now tell me a bit

9   about the likelihood of success on the merits.

10          **MR. FLEMING:**  Sure.  So I think there are two

11  arguments on likelihood of success on the merits.  I think the

12  first bucket is the it's not a security, and then the second

13  bucket is even if it is a security, it's not subject to U.S.

14  law, or this isn't the right forum.

15      So on whether it's a security, we put in the Eastern

16  District of New York's decision in the *PlexCorps* case.

17          **THE COURT:**  That's an SEC action.

18          **MR. FLEMING:**  It is, but it's the same test for

19  whether it's a security.  The Court expressly found that the

20  tokens at issue there were securities, and that's the same test

21  here.

22      I think there's a difference -- the distinction that they

23  made for *PlexCorps* was that the SEC has somewhat broader

24  statutory authority to seek an injunction than we do.  But I

25  don't think that goes to the question of whether it's actually

1   a security.

2          **THE COURT:**  Okay.

3          **MR. FLEMING:**  Similarly, you have the SEC's

4   investigative report in the *DAO* matter, finding that those

5   tokens were securities; and you have the SEC's order on the

6   *Munchee* matter, which is cited on page 18 of the DLS brief.

7   That's an ICO finding them securities.  We have the statements

8   by the current SEC Chair saying that he's yet to see an ICO

9   that isn't a security; former SEC Commissioner saying that the

10  the most open and notorious violation of the securities laws

11  since Hammurabi.

12      The defendants don't cite any decision on which a court

13  found the tokens issued in an ICO were not securities.

14          **THE COURT:**  In fairness to them --

15          **MR. FLEMING:**  It's recent.

16          **THE COURT:**  -- we don't have a flood of cases.

17          **MR. FLEMING:**  For sure.

18          **THE COURT:**  We don't have any.  Do we have any

19  appellate decisions?

20          **MR. FLEMING:**  No appellate decisions, to my knowledge.

21      I think their real argument on whether it's a security is

22  this idea that it's actually a donation.  The problem for them

23  is that that's foreclosed by the Ninth Circuit's decision in

24  the *Warfield* case, which was cited in our opening brief.

25  There, defendants were selling something that they termed "gift

1    annuities."  And they argued that purchasers hadn't made an

2    investment.  They were actually just motivated by charitable

3    impulses.  The Ninth Circuit rejected that argument and noted

4    that the gift annuities in that case had been marketed as

5    investments.

6         That's true here, and we said it at length in our papers -

7    all the various ways that these were marketed as investments

8    where you're hoping that the token is going to appreciate in

9    value, and you're depending on the managerial efforts of

10   others, in particular the Breitmans in their efforts to develop

11   the technology.

12        Indeed, Defendant Draper himself talks about these as

13   securities.  He was asked by a Reuters reporter when, you know,

14   when the dispute first came to light:  *How much did you*

15   *contribute?*  And he said:  *Do you mean how much I bought?*

16   Mr. Draper is a pretty sophisticated guy.  I think his response

17   speaks volumes here.

18        I mean, I would note there's no response in defendants'

19   paper to *Warfield*.

20        **THE COURT:**  The case, the *Jamins* (phonetic) case out

21   of Brooklyn is also brought under Federal Securities Laws.

22        **MR. FLEMING:**  It is.

23        **THE COURT:**  I believe, and as you point out, the

24   related case that's set for preliminary injunction hearing is

25   also a Federal Securities Laws.  But you made a big point of

1    out you're bringing the case under state securities laws, and

2    have intimated to me there's some significance in that

3    distinction.   And I take it in part that the -- you're not

4    saddled with the PSLRA showing the requirements.

5         Is that the difference for purposes of assessing the

6    likelihood of success on the merits, or is it something

7    different?

8         MR. FLEMING:   No, I don't think there's a meaningful

9    difference in terms of success on the merits.   I think both the

10   California Securities Act and the Federal Securities Act both

11   prohibit the unregistered sale of securities.   There are

12   exemptions in both, but defendants haven't made any argument

13   that they fall under one or the other.   The argument that would

14   apply equally to both I think is this is or isn't a security.

15        I would also note that our UCL claim is brought on the

16   basis that the unlawful predicate is a violation of --

17        THE COURT:   Can you go back to the federal statutes by

18   virtue of the UCL?

19        MR. FLEMING:   We tried to sort of get that belt and

20   suspenders, belt and suspenders.   So I don't think that that

21   distinction is relevant.   I didn't see anything in defendants'

22   papers arguing that the test under California law is different.

23        And so the second question on the likelihood of success on

24   the merits is the argument that -- basically talking about the

25   terms and conditions, which include some provisions purporting

1    to apply the law of Zug, Switzerland, and purporting to say

2    that that's the appropriate forum.

3          As an initial matter, plaintiff didn't agree to the terms

4    and conditions.  We allege in our complaint that they were

5    hosted on a different web site:  You signed up for this through

6    crowdfund.tezos.com.  The terms and conditions were hosted on

7    Tezos.CH.  That web site is down, but we located -- I looked at

8    a video -- a video on You-Tube walking someone through how to

9    sign up, and there's no click-the-box.

10         The Ninth Circuit talked about this a year or two ago I

11   believe in the *Yuen* decision, the difference between a

12   browsewrap agreement, which there's just a hyperlink posted on

13   a page somewhere, versus clickwrap.  I think we're clearly on

14   the right side of that.

15         Even by its own terms, if the terms and conditions aren't

16   a contract, paragraph eight, section 1 -- and this is attached

17   as Exhibit 2 to the declaration submitted with the Tezos

18   opposition -- quote:

19              This document does not constitute a prospectus of any

20         sort, is not a solicitation for investment and does not

21         pertain in any way to an offering of securities in any --

22         it's actually cut off, but -- sorry -- and does not

23         pertain in any way to an offering of securities in any

24         jurisdiction.  Quote:  It is a description of the

25         functionality of a software-based fundraising campaign.

1          So by its own terms it's not purporting to be a contract.

2    It's a description.

3          And even if you take them seriously, it's illusory or so

4    unbalanced as to be unconscionable, because it's saying you're

5    not guaranteed anything.

6          Even if they were a valid contract, the choice of law and

7    choice of forums provisions are unenforceable under the

8    anti-waiver provisions of the California Securities Act, as

9    well as the Federal Securities Act, which is incorporated in

10   our UCL claim.

11         The *Bremen* case that is cited says that a contractual

12   choice of forum clause is unenforceable if enforcement would

13   contravene a strong public policy in the forum in which the

14   suit is brought.  We have that here.  Section 25701 of the

15   California Securities Act is an anti-waiver provision.

16         We also cite *Hall versus Superior Court* in our

17   application, which says that the right of a buyer of securities

18   in California to have California law apply can't be waived.

19         There's also a similar 29A of the Federal Securities Act

20   as a similar waiver.

21         The Class --

22         **THE COURT:**  So they can't just plain -- where is it

23   Alderney, the Channel Islands?

24         **MR. FLEMING:**  Somewhere -- I think they want to be in

25   Zug, but I'm not -- or maybe it's Zug law.

1          **THE COURT:**  I think there's something about the

2     Channel Islands.

3          **MR. FLEMING:**  I'm sure they're lovely this time of

4     year, but I don't think California law allows them to get

5     there.

6          It also has a class waiver provision that runs afoul of

7     California law, *Discover Bank*, and then also just this year in

8     *McGill versus Citibank*.

9          *Discover Bank* was partly overruled by the U.S. Supreme

10    Court in *Concepcion*, but that deals with the Federal

11    Arbitration Act.  There's no arbitration agreement here.  So

12    once there's no deference to an arbitration clause or

13    preemption of a state law that might interfere with

14    arbitration, I think we're back in the *Discover Bank* world

15    where that class waiver is not enforceable.

16         And, again, really the only case they cite on this is

17    *Morrison*.  *Morrison* arose in a very different context.  It was

18    a foreign cubed case, so to speak, which means foreign

19    investors, foreign company, and a foreign exchange.

20         This is a different case.  You have a U.S.-issued, or DLS

21    based in California, you have a U.S. buyer, Mr. McDonald is

22    based in California.  And their decision cited after *Morrison*,

23    including the *Traffic Monsoon* case, an SEC decision out of

24    Utah, which dealt with an Internet security, for lack of a

25    better word, which held that there's a domestic transaction

1   where the investor incurred irrevocable liability in the U.S.

2   That's clearly Mr. MacDonald.  He bought this in the U.S.  He

3   incurred the liability to pay.

4       Here -- and also, again, the issue where DLS is in

5   California.

6       And I think that actually goes both to the question of

7   what law applies, and also to personal jurisdiction; that this

8   transaction, when it's happening on the Internet, is happening

9   in multiple places.

10      **THE COURT:**  If injunctive relief were to issue here,

11  you have to deal with the bond issue.

12      **MR. FLEMING:**  Yes.

13      **THE COURT:**  How do you calculate the appropriate bond

14  here?

15      **MR. FLEMING:**  We would argue that a nominal bond is

16  appropriate, because this is a class case, and the relief

17  sought is, in terms of time, is very small.

18      As I said, I do think that if the Court --

19      **THE COURT:**  So you -- so if preliminary injunction

20  were to issue, then you're sort of -- by suggesting the

21  duration is, you know, of great moment, that means the bond

22  would have to go up substantially.

23      **MR. FLEMING:**  I think there's a relation between the

24  two.  I don't know that an enormous bond is justified if just

25  because the relief sought is longer.  But certainly here, where

```
 1   the relief sought is narrow, I do think a nominal bond would be
 2   appropriate.
 3       And, again, I think the reason you have a bond is to
 4   compensate a defendant for harm in the event that a TRO or
 5   injunction is issued improperly.
 6       Here, as I said, I do think that if the Court finds
 7   jurisdiction, does find that a preliminary relief is
 8   applicable, I do think, in terms of sort of balancing the harms
 9   and balancing the equities and minimizing harm to the
10   defendants, I do think that we would be able to work out
11   language on some sort of ordinary course exception to the TRO
12   that it will allow some spending for legal fees.
13          THE COURT:  You -- in something you filed yesterday,
14   it had some press reports or something regarding some aspects
15   of this Internet fight between directors of the Swiss entity.
16   And when I read that, I took from that that everything seems to
17   be so frozen, no pun intended with whatever the weather is in
18   Switzerland --
19          MR. FLEMING:  Sure.
20          THE COURT:  -- that the Swiss banks and others are
21   refusing to process, if you will, transactions and the like.
22   Doesn't that cut against you?  In other words, it doesn't look
23   like even if there were, you know, some sort of effort to loot,
24   as you say, the funds, that they couldn't get very far.
25       And my related question, it's not directly related, but I
```

1   understand your arguments as to why this is all sale of

2   securities and all the rest of it.  But the other aspect of

3   what you're claiming is there's this looting going on.  Where

4   is there any evidence that that's taking place?

5        The funds are there.  The funds appear not to be even able

6   to be moved even if someone wanted to move them.  Where is the

7   looting?

8        **MR. FLEMING:**  Sure.  So I'll answer your questions in

9   order.

10        The first question is the significance of the statements

11   put in in the supplemental declaration.  And so these are posts

12   by someone who claims to be Defendant Schmitz Krummacher, the

13   director of the Foundation who resigned.

14        **THE COURT:**  He's the defrocked director.

15        **MR. FLEMING:**  I'm sorry?

16        **THE COURT:**  He's the one that's being removed.

17        **MR. FLEMING:**  No, that's -- Mr. Gevers is the one.

18   And this is important.

19        So the story in October that was reported through the

20   public media was the Breitmans accused Mr. Gevers, who I'm not

21   sure if his title is the Chairman, but he's the most senior

22   director of the three-person board of the Foundation.  They

23   accused Mr. Gevers of seeking to have an unjustified bonus paid

24   to him.  And there was -- the report suggested the bonus may

25   have actually been paid.  That's how we read it.  I did note

1   the footnote in the DLS brief that yeah, he was actually

2   prevented from doing that.

3        I don't actually think it matters.  And the reason why is

4   because now what happened in October and what was reported is

5   that Schmitz Krummacher and Ponz/Olivier Fernandez, the other

6   two directors, had removed Mr. Gevers.  He accused them of an

7   illegal coup, he said this is unfair.

8        Now with Mr. Schmitz Krummacher resigned, now we have

9   Gevers and Ponz.  Gevers gets to choose the replacement for

10  Schmitz Krummacher.  And so our concern is that with that

11  majority control of the board, there will no longer be that

12  counterweight to sort of prevent him from paying the

13  unjustified bonuses.  Our understanding --

14        **THE COURT:**  The unjustified bonuses, even if all paid,

15  there are seven figures, you're saying.

16        Again, the amount of money that is in, as you tell me, is

17  in the hands of this Foundation is vastly beyond that, so their

18  ability to pay any judgment at the end of the day is not going

19  to be impacted by this, even if this bonus is paid.

20        **MR. FLEMING:**  The impact of the ability to pay would

21  not be impacted by a single seven-figure bonus.

22        Our concern is that -- and, again, this is coming from his

23  co-defendants.  The Breitmans have accused Mr. Gevers of sort

24  of being untrustworthy and trying to sort of take the money and

25  run.

1          And one point I did want to make, and this is important.

2     Our understanding, which has evolved a bit, and based on

3     conversations with counsel, is that there are sort of two pots

4     of money sitting in Switzerland right now.  There is -- the

5     assets that are still held in cryptocurrency form, so Bitcoin

6     and Ethereum, those assets -- there is a requirement to have

7     Bitcoin Suisse Act as the counter signatory before those funds

8     can be converted.  It's not totally clear to us whether Bitcoin

9     Suisse is simply authenticating that the request is coming from

10    someone at the Foundation, or whether they're doing a broader

11    analysis of the propriety of the request.

12         There is also approximately $78 million in mostly in Swiss

13    franks, but in fiat currency, so Swiss franks, I think some

14    dollars, some euros, sitting in a Swiss bank account.  Our

15    understanding is that Mr. Gevers is the sole signatory who has

16    authority over those funds.

17         So there's sort of those two pots of money.

18         So between Schmitz Krummacher resigning and Gevers getting

19    to appoint his replacement, as well as Gevers having sole

20    signatory authority over those funds, we do have concerns based

21    on claims made by the Breitmans, who are in sort of a better

22    position than any to know.

23         **THE COURT:**  Again, their claims are focused, it

24    appears, on concern about these bonuses.

25         Is there any other evidence of this generic looting that

1    you're concerned about beyond this dispute about the issue of

2    are these bonuses proper or not proper?  What is the other

3    evidence?

4          **MR. FLEMING:**  Sure.  The bonuses are our most

5    significant concern.

6        I will also say that from our perspective any money that's

7    being spent by the Foundation is money that, you know,

8    ultimately belongs back to investors, because this was all

9    raised in illegal unregistered securities offerings.

10       So, you know, if you rob a bank and then use that money to

11   cure cancer --

12         **THE COURT:**  Sure.  That goes -- there is -- the

13   element that I'm focused on now is irreparable injury.

14         **MR. FLEMING:**  Right.

15         **THE COURT:**  If you could get a money judgment at the

16   end of the day, if you prevail on the merits, you don't need

17   injunctive relief.

18       And so the question is where is the dissipation of these

19   funds in some sort of an immediate way that warrants a very

20   extraordinary remedy, i.e., a court in California stepping into

21   the fray and saying *you can't do it, you're all frozen, you*

22   *can't do anything*.

23         **MR. FLEMING:**  Sure.  And so the additional --

24         **THE COURT:**  You're saying because there's looting

25   going on.  Well, the only looting that you're pointing to is a

1  dispute about the propriety of a seven-figure bonus that

2  apparently wasn't paid at the end of the day anyway.

3       **MR. FLEMING:**  That was stopped by two directors, one

4  of whom is no longer there.

5       But I agree.  And it's looting plus conversion.

6       So the other concern -- and this was addressed in our

7  papers -- is that the recision remedy that's provided by the

8  statute is for the consideration paid.

9       And so in the case of our plaintiff and the other people,

10 for the most part a few people paid in fiat currency, U.S.

11 dollars.  The vast majority of people, to our understanding,

12 paid in Bitcoin or Ethereum.  That value has gone significantly

13 up since then.  Now, maybe it goes to zero six months from now.

14 If I knew that, I probably would be on a beach somewhere, not

15 here.  But if it does continue to go up, and if it does become

16 more volatile, the conversion of these crypto assets to fiat

17 currency means that they won't be able to make full restitution

18 to people, because they won't be able to go back into the

19 marketplace and buy -- you know, if you had ten Bitcoin and you

20 converted them to $5,000, and then six months later you still

21 have $5,000, but it costs $20,000 to buy a single Bitcoin,

22 you're not going to be able to make restitution.

23      Our Class Members are people who are believers in crypto

24 currency and believers in the space.  So we do think that that

25 also weighs in favor of preliminary relief, you know, less so

1   in the, you know, immediate future before we can get a

2   preliminary injunction hearing.  But that is an important part

3   of why preliminary relief is appropriate.

4          THE COURT:  All right.  Well, thank you.

5      Let me, before -- I'll give you another chance to weigh

6   in --

7          MR. FLEMING:  Sure.

8          THE COURT:  -- but let me hear from somebody on the

9   defense side.

10     And just who is proposing to make any sort of comments?

11     We've got -- you're representing DLA, or who are you?

12         MR. POTISCHMAN:  Good morning, Your Honor.  Neal

13  Potischman on behalf of the Tezos Foundation.

14         THE COURT:  The Tezos Foundation.

15     And just so that -- Mr. Gibbs, you're representing?

16         MR. GIBBS:  DLS.

17         THE COURT:  DLS, excuse me.

18     And then will I also be hearing from --Yes?

19         MR. WANGER:  I represent Tim Draper and Draper

20  Associates.

21         THE COURT:  Draper, okay.  And that's the -- are those

22  the three entities or groups that want to talk about this this

23  morning?

24         MR. GIBBS:  Yes, Your Honor.

25         THE COURT:  Okay.  So let's start with the Tezos

1  Foundation.

2          **MR. POTISCHMAN:**  Good morning, Your Honor.

3          **THE COURT:**  Good morning.

4          **MR. POTISCHMAN:**  Your Honor, I should note at the

5  outset that, as we've said in our papers, the Tezos Foundation

6  contests jurisdiction --

7          **THE COURT:**  You're making a special appearance.

8          **MR. POTISCHMAN:**  But I'd like to not begin there.  I'd

9  like to begin with irreparable harm, because it seems to me

10  that the Court's analysis can begin and end there.

11      We engaged in rather lengthy meet and confers over the

12  last few days in an effort to convince plaintiff's counsel that

13  there was no need for this hearing today.

14      And I think just focusing on irreparable harm, even if we

15  don't get to the merits, even if we don't talk about

16  jurisdiction, it's very clear.  Your Honor hit the nail on the

17  head.  If you look at their papers, at page 15, they have their

18  account of the looting.  It's based on hearsay accounts.  It's

19  not based on firsthand information about anything.  They talk

20  about a bonus that wasn't paid.  And I should add that even if

21  a bonus had been paid, I don't believe that would be improper.

22  I think that would fundamentally be a Swiss Foundation

23  question.

24      But put that aside.  The bonus wasn't paid.

25      The information we have -- and we were informed we were

1   retained on Thursday, Your Honor, so whatever information we've

2   gathered has been quick, and we could try to follow this up

3   with further declarations, if it would be relevant -- is that

4   of the currency that was contributed originally, approximately

5   78 million was converted.  This was announced at the beginning

6   of July, Your Honor.  So, again, the story of urgency, we're

7   not seeing it at all.

8        The Foundation announced that it was going to do some

9   conversions -- which we frankly think is certainly a

10  justifiable decision from a fiduciary perspective, if you

11  assume the Foundation is fiduciary -- began doing conversion,

12  $78 million worth, 78 million Swiss francs, but the conversion

13  is almost exactly the same.

14       So 78 million in crypto currency was sold.  A little bit

15  was converted into dollars, a little bit was converted into

16  euros.  That money, as we've explained to plaintiff's counsel,

17  is being held at Zurich Kantonal Bank, K-A-N-T-O-N-A-L B-A-N-K.

18       The crypto currency conversions were stopped in October.

19       In terms of the burn rate and the expenses, most of the

20  public sources that have been cited have been complaining about

21  the lack of development.  And as Your Honor pointed out, the

22  supplemental declaration that was submitted yesterday, even

23  assuming that it's authentic, I think we frankly would be glad

24  if it were authentic, because his point is the money -- he says

25  the money is still sitting there, and that nothing is

1  happening.

2      Our representation, based on our information to

3  plaintiff's counsel, is that from the fundraising to now,

4  excluding legal fees, which are now starting to accumulate,

5  obviously, less than $1 million has been spent.

6      So, Your Honor, we're just -- we don't see the irreparable

7  harm.  We don't --

8      **THE COURT:**  Well, what does seem to be somewhat

9  undisputed is that this -- this whole structure, if you will,

10  is in turmoil at the moment, it appears, with a lot of

11  internecion fighting going on between the participants, both

12  with respect to the board of your client, and then vis-a-vis

13  some of the California participants in that group.  And isn't

14  that cause for some concern, that while there may not have been

15  anything thus far that has occurred, as you have no reason to

16  question your status report, if you will, on where things stand

17  now, isn't there a certain lack of comfort that things are

18  under control and in some sort of a logical process with all

19  these directors, the few that they have fighting each other and

20  pointing the finger and who has authority and who doesn't?

21      **MR. POTISCHMAN:**  I have a couple responses, Your

22  Honor.

23      The first is I think if we think of a typical U.S. style

24  litigation, if there were allegations like this made about a

25  U.S. corporation, it's inconceivable to me that the remedy

1  would be a TRO freezing the corporation's assets.  And I don't

2  think it's different merely because the entity happens to be

3  overseas.

4      Moreover, this entity is being overseen by Swiss

5  Foundation authority, and that has a real function.  The Swiss

6  authority, according to press reports, have become involved.

7  But in the absence of any indication -- the turmoil that's been

8  described here is turmoil causing stagnation, and so it's

9  difficult to see how that turmoil needs to be addressed --

10      **THE COURT:**  Well, let's just take one little piece of

11 what counsel mentioned.

12      Mr. Fleming mentioned -- and maybe you can assuage any

13 concern on that point -- the $78 million pot of money, which

14 apparently is what I guess the crypto currency was converted

15 into traditional currency.  And he suggests that this one

16 director who was removed and now is floating out there and is

17 the subject of the aborted bonus, and now may have authority to

18 replace the director that's gone, that director has effectively

19 complete control over that 78 million-dollar pot of -- or

20 signatory authority over that; is that true?

21      **MR. POTISCHMAN:**  Yes.  And, Your Honor, that

22 information was communicated to them by us.

23      **THE COURT:**  Well, why is that not a subject of

24 concern, for example?

25      **MR. POTISCHMAN:**  Multiple reasons, Your Honor.

1          First of all, my understanding is that both Mr. Gevers and

2     the director who resigned, he was not removed, he resigned,

3     both had sole signing authority.

4          **MR. FLEMING:**  Okay.

5          **MR. POTISCHMAN:**  And then one director resigned.

6          It is further my understanding that the Foundation is in

7     the process of soliciting a third director.  It is not my

8     understanding that Mr. Gevers gets to hand select that person.

9     It is my understanding that the plan, once there is a third

10    director who was in place, is to have joint signing authority

11    required to avoid any issue or any appearance.

12         At the present time the second director is not in

13    Switzerland, and so I don't think it's feasible to have them

14    have to cosign papers when they're not in the same country.  I

15    don't know how that would work.

16         But I think they have -- Your Honor, sort of in light of

17    the claims, the hearsay claims that are out there, they've sort

18    of created an appearance of smoke.  I just don't think there's

19    any -- the smoke is illusory.  There is no fire.  They spent

20    less than a million dollars.  Mr. Gevers has had the sole

21    signing authority since the beginning of when this started, and

22    the money hasn't been spent.  So the question is would he

23    today?  Is there reason to believe that today --

24         **THE COURT:**  Well, remember, though, as Mr. Fleming

25    points out, while it is an extraordinary remedy to get a TRO,

1    and plainly I understand that, he does make a point that we're

2    talking about a TRO that would last for effectively 14 days.

3    It can be reupped a bit.  We're talking about a very brief

4    period of time, kind of a standdown type of arrangement.

5        So that's why I was sort of hoping, even if you contest

6    jurisdiction, think they'll never be able to prevail in any

7    way, shape or form, that the defense side might have said,

8    well, we weren't planning to -- you know, because of the nature

9    of the way things stand, nothing was going to change between

10   now and the preliminary injunction, so we'll agree to just

11   effectively keep everything the way it is.

12       I understand you don't want to sign onto that, and thereby

13   perhaps waive jurisdiction, and although there are usually ways

14   to right around that.  But that's why I didn't quite understand

15   why there wasn't an agreement effectively to get us to a

16   preliminary injunction hearing where this can be fleshed out a

17   little bit more.

18          **MR. POTISCHMAN:**  I think the most direct answer to

19   that question, Your Honor, is Swiss law.  Swiss laws limits

20   what we're able to do, certainly on the timeline that we've

21   been presented with, to try to -- plaintiffs' counsel wants the

22   court effectively this agreement submitted to the Court, and

23   that's going to pose a problem as a matter of Swiss law.  It

24   certainly posed a problem between Thursday afternoon and this

25   morning.

1      But I will also add, Your Honor, that on their best case

2    on the plaintiff's side, the best possible case, it seems to me

3    if they're right about everything, they perhaps represent, in

4    the future, would represent a class of California contributors

5    or donors.  There is absolutely no showing that -- in any way

6    about how much money was contributed by California donors or

7    contributors.  There's been plenty written in the press about

8    how much interest there is in crypto currency in Asia in

9    particular and in other countries.

10      **THE COURT:**  You're saying the percentage of

11   investors -- I know you call them donors, I'm a bit skeptical

12   about that -- but if they are characterized one way or the

13   other, the percentage is going to be, of Californians, is

14   not -- well, we can't assume it's going to be the majority by

15   any means.

16      **MR. POTISCHMAN:**  I think we can't assume it would be

17   anything close to the majority.

18      And I will say that on all these issues, Your Honor,

19   including on irreparable harm, the burden is theirs, and the

20   burden is theirs to show that this is not speculative.

21      I think the discussion we're having, frankly, focuses in

22   on the speculative nature of the irreparable harm they've

23   claimed; that maybe Gevers will try to do something that he has

24   not done; that maybe money will be spent that thus far has not

25   been spent.  I mean, there's just no -- there's nothing

1   concrete about this.

2          **THE COURT:**  Let me ask you on the point that I started

3   with, which is an interesting question, just at this very

4   preliminary stage of the case -- we'll see what it ends up

5   looking like -- but it's several class -- putative class reps

6   that want me to ultimately make this a class action in one form

7   or another, but right now somebody is coming for a TRO.

8          How do I assess -- can I -- is it your position that I

9   would have to look at Mr. MacDonald as simply one person, or

10  can Mr. Fleming represent a putative class at this stage for

11  purposes of assessing a TRO request?

12         **MR. POTISCHMAN:**  Your Honor, I think, very frankly, we

13  would need to review additional authority on that question.

14  Our position is that he is one, but that to some extent it

15  doesn't matter, because even if he represented everybody he

16  claims, it doesn't change the irreparable harm analysis.

17         The case that he mentioned here, it sounds like it was an

18  unpublished decision in a somewhat -- it sounds like a somewhat

19  different context.  We certainly -- I think it's in the

20  Foundation's interest, and it's even in the contributors'

21  interest if this litigation gets organized to some extent.

22  Because right now it's difficult, and more money is being spent

23  that might otherwise need to be spent.

24         So we'd love to see it coordinated.  We'd love to see,

25  frankly, Your Honor, the schedule pushed out somewhat in

1   Okusko, so that we have additional time to get up to speed.  We

2   know there are individual defendants who are trying to consult

3   with their own counsel.  We are glad to brief things in a

4   coordinated matter in all the cases, as opposed to doing a

5   seriatim briefing.

6       But to answer your question directly, based on what we

7   know so far, we think they represent an individual, not a

8   class.

9           THE COURT:  Just for my edification, are there other

10  cases besides the -- I guess before now -- that are in front of

11  me?  Are there cases in other jurisdiction that have been

12  filed?

13          MR. POTISCHMAN:  There is one case in the Middle

14  District of Florida that I'm aware of where, as far as I'm

15  aware, the Foundation has not been served in any process, and

16  I'm not aware of the procedural status of that case.  I don't

17  know if there are any others.

18          MR. FLEMING:  That's consistent with our

19  understanding.

20          THE COURT:  Pardon me?

21          MR. FLEMING:  That's consistent with our

22  understanding.

23          THE COURT:  Okay.  Why don't I hear from your

24  colleagues on the defense side.

25          MR. POTISCHMAN:  Thank you, Your Honor.

1          **MR. GIBBS:**  Thank you, Your Honor.  Patrick Gibbs from

2     Cooley on behalf of Dynamic Ledger Solutions.

3          Your Honor has obviously read all the papers and is

4     familiar with the issue, so I won't rehash things.  I want to

5     make a couple of quick points, though, unless Your Honor has

6     particular questions for me.

7          The first thing I would say is there was a lot of

8     back-and-forth so far about irreparable harm.  The Court

9     clearly has a handle on that issue.  But what I wanted to focus

10    us on is immediate irreparable harm, imminent irreparable harm.

11    So the question is not just why we're here talking about an

12    injunction, but why we're here on a few days notice talking an

13    injunction based on very little information before the Court.

14         You know, the reason that type of extraordinary relief is

15    granted is if there is a serious risk of something that's going

16    to happen soon.  Mr. Fleming understandably wants to emphasize

17    it's just for a short period of time.  It's just a little short

18    timing injunction.  But the fact is that's an extraordinary

19    intrusion --

20          **THE COURT:**  Right.

21          **MR. GIBBS:**  -- on the affairs of an organization that

22    has business to do.  It has work to do.  And we don't do that

23    lightly just because it's only a couple of weeks.  We do that

24    when there's a very serious risk that something really bad is

25    going to happen really soon.

1          **THE COURT:**  True.

2          **MR. GIBBS:**  And there's literally no showing on that

3     here.  Nothing.  So that's one important point.

4          On your question about why should Mr. MacDonald speak for

5     a class, I want to bring out something that hasn't really been

6     discussed, which is the interest and desires of other

7     participants.

8          **THE COURT:**  Right.  Because I understand that there

9     are -- oh, it's somewhat anecdotal almost by definition has to

10    be because of the stage of this, that there are a lot of people

11    that they want this thing to keep going and develop it, and

12    they're true believers, and they're not in league with the

13    notion that there's been violations.

14         **MR. GIBBS:**  Yes.

15         **THE COURT:**  And I understand that.

16         **MR. GIBBS:**  Yes, you know, there's been some debate

17    about the legal question about whether it's ever appropriate to

18    issue class-wide relief before a class has been certified.

19         You know, you can't tell much from the *Just Film* case.

20    It's unpublished for a reason, because it doesn't really tell

21    you what it's about.

22         But even if we assume there are some cases where that type

23    of class-wide relief is appropriate before a class has been

24    certified, my principal point has to do with the facts of this

25    case.  It's not simply a question of how many people does he

1   get to represent, and the rest of the people in that group are

2   sort of indifferent to what happens.

3         Here, we have actual direct conflict.  The relief that

4   Mr. MacDonald's lawyers are seeking here is to halt the entire

5   project and give all the money back, to stop the entire thing,

6   with tens of thousands of people who gave money back in July to

7   fund a project.  They want to stop that project in its tracks

8   on a few days' notice, and then get an order sending the money

9   back out.

10        There are plenty of people -- and when we have time we'll

11  bring evidence to the Court of this -- there are plenty of

12  people who participated in that process and gave substantially

13  more than $5,000 to the project who don't want that remedy.

14  It's the opposite of what they want.  And so I would submit

15  that on the facts you absolutely cannot allow Mr. MacDonald to

16  purport to speak for all these people.  We know he doesn't.

17        So whether it's balancing the equities, considering the

18  public interest, an issue of class cert, it doesn't really

19  matter.  On the facts it is not appropriate right now on this

20  record to halt this project entirely.

21            **THE COURT:**  Okay.  Let me ask you about your client in

22  particular.

23        Doesn't seem like there's any jurisdictional question that

24  crops up with DLS; right?

25            **MR. GIBBS:**  Correct.

1            THE COURT:  It's a California entity.

2            MR. GIBBS:  Correct.

3            THE COURT:  The injunctive relief that is being sought

4    would -- how would your clients play into that -- let's assume

5    there is injunctive relief that's issued in one form or

6    another, TRO, preliminary injunction, what have you.  What's it

7    directing your clients to do?

8            MR. GIBBS:  I think that's an excellent question.  I

9    don't know what it would direct my client to do, because my

10   client doesn't have the ability to exercise any control over

11   the assets that the Foundation holds.  The corporation does not

12   have any control over the Foundation whatsoever, so there's --

13           THE COURT:  Well, then remind me again of their -- the

14   role of your client vis-a-vis setting up the Swiss entity.

15       I mean, your clients were -- are the launchers, if you

16   will, of this grand project; right?

17           MR. GIBBS:  I don't mean to quibble, but I think when

18   you say, "the launchers of the project," you're probably

19   talking about Mr. and Mrs. Breitman.

20           THE COURT:  Yes.

21           MR. GIBBS:  I don't represent them individually.  I

22   represent the corporation.

23           THE COURT:  No, I understand.  But then they, along

24   with Mr. Draper, they put together DLS; right?  Is that fair?

25           MR. GIBBS:  Yes.

1          THE COURT:  And then DLS was put together for the

2    purpose of this ultimate project.

3          MR. GIBBS:  Yes.

4          THE COURT:  With respect to this crypto currency.

5          MR. GIBBS:  Yes.

6          THE COURT:  Okay.  So then when it -- once the entity

7    was put together, the relationship between the entity -- I'm

8    just learning this stuff, because while you haven't had a lot

9    of time, mine was about the same as yours -- did they cause the

10   Swiss Foundation to be constituted?  I'm just trying to get a

11   sense of who is who in this thing.

12         MR. GIBBS:  There are -- I want to be careful, because

13   I don't have perfect information.

14       Certainly the individuals who are involved with my client,

15   DLS, played a role in putting in motion the creation of the

16   Foundation.  But the Foundation was created as an independent

17   entity, and so once they put that process in motion, they

18   relinquished the ability to -- they never had the ability to

19   control this.

20         THE COURT:  But somebody has got to be in a position

21   to proceed with this project.  So I assume -- they didn't just

22   accumulate these funds, have them placed with this Swiss

23   entity, and then said -- in other words, you're not contending

24   they're now saying they're done, they've done everything

25   they're going to do, they have no involvement, they have no

1   ability to impact at all how the funds are going to be utilized

2   for developing this project, they're still involved --

3   right? -- DLS.

4        **MR. GIBBS:**  DLS is still involved, but we need to be

5   precise about what that means.

6        And no, I'm not saying that DLS is now defunct and it's

7   not going to do anything, but that doesn't mean it has any

8   control over the funds.

9        DLS, the corporation, owns the intellectual property that

10  is central to the project, right.

11       **THE COURT:**  Yes.

12       **MR. GIBBS:**  In other words, let me step back.

13       **THE COURT:**  In other words, they've got -- they're the

14  brains of how this is all going to work, that IP is held by

15  this entity.

16       **MR. GIBBS:**  Yes.  And the entity presumably will

17  continue to develop and do more work to help develop the

18  network, although it will not be the only person or entity that

19  does that.  I mean, the whole point of these blockchain

20  technologies is to create a decentralized system, a network.

21       **THE COURT:**  Understood.

22       **MR. GIBBS:**  And so DLS won't be in charge of the

23  network either.  It is doing a lot of the initial development

24  work.  It is where that IP resides, but that doesn't give it

25  control over the dollars.

1      **THE COURT:**  Okay.  But presumably --

2      **MR. GIBBS:**  Or the Bitcoin.

3      **THE COURT:**  -- this activity is going to be funded in

4  part by the dollars that are sitting in Switzerland, or they're

5  not dollars -- well, there are some dollars, there's some other

6  assets.  But the assets that are in Switzerland are going to be

7  utilized to fund the development of the project which DLS will

8  be involved in, and will be presumably drawing from some of

9  those funds; right?

10     **MR. GIBBS:**  It may, yes, depending.  But, yes, the

11 Foundation was created to foster the development and adoption

12 of this technology.

13     **THE COURT:**  Right.  And what I'm trying to get a

14 handle on is so who has got the -- who can make the decision,

15 where in this collection of participants is the decision made

16 we are going to employ X amount of these assets towards this

17 aspect of the development we want the funds to move.  Who can

18 make that -- who can tell the holders of the assets "move these

19 funds"?

20     **MR. GIBBS:**  The Board of the Foundation, as I

21 understand it, subject to oversight by the Swiss regulators,

22 has the only authority -- there's no one who can tell --

23     **THE COURT:**  Well, they have ministerial authority

24 definitely, and they can say -- their names are no doubt

25 required on any kind of transfer.  But the directive to when --

1    how the funds -- when and in what way the funds are employed,

2    that's not the Swiss directors, is it?  They're not making the

3    qualitative judgment on how this project is to be developed,

4    are they?

5         **MR. GIBBS:**  They are -- they have control over the use

6    and disposition of the assets held by the Foundation, yes.

7         No, my clients don't have the ability to tell them, okay,

8    go sign this thing and spend X amount of assets on this

9    particular piece.  They don't have that ability.  The

10   Foundation is independent.  The money was raised by the

11   Foundation.  The Foundation is an independent entity, and it is

12   controlled by its Board subject to oversight by the Swiss

13   regulators.  DLS and the principles behind DLS do not have the

14   ability to tell them how to spend money or assets.

15        **THE COURT:**  I mean, I recognize that I may be, you

16   know, looking at all of this from an antiquated perspective

17   where I expect that I'm able to determine in this structure

18   where certain things are done, and maybe that's, you know, old

19   thinking, and I don't understand.

20        But I will say that when we move forward in this matter, I

21   will be asking the perhaps, you know, outdated questions about

22   who is calling the shots, and when and why and how, and it will

23   be -- those who won't have the answers should be prepared to

24   tell me why this is a new day, and I shouldn't be asking those

25   questions.

1          Because I'm somewhat, from the little I now know, a little

2     mystified about how this all is operating.  And even the -- as

3     I expressed some skepticism about donors rather than investors,

4     and maybe I should leave my cynicism aside, but I'm assuming

5     that even if some of these folks who are putting money into

6     this are true believes, and I'm sure they are, they also would

7     like to get something out of this, rather than just, you know,

8     a bright new world.  They actually want some recovery here.

9          Now, maybe I'm wrong, and maybe you'll be able to dissuade

10    me of that.  But I have to admit I'm a bit skeptical that it's

11    altruistic as maybe it's been suggested to me.

12         But you don't even have to answer that question.

13         **MR. GIBBS:**  Yeah, I won't start a debate about it.

14    But I do -- I guess I would simply say I understand the Court's

15    reaction to a type of organization and a project that doesn't

16    look like the kinds of things that U.S. lawyers are used to

17    looking at.  That's true.  This is a new thing.  And it is --

18    you know, the U.S. model of corporations and LLCs, and other

19    business organizations doesn't look like this.  But, you know,

20    the underlying premise here is the creation of a network that

21    will -- the control of which will ultimately rest in the hands

22    of a whole bunch of anonymous people who don't know one

23    another, and they will be able to make decisions about the

24    development of the network from there.  That's a new thing.

25    That's not something that U.S. lawyers like me are used to

1    looking at either.  And so I understand, Your Honor.  I'm

2    getting used to this new stuff too.

3        But the answer to the Court's question is DLS does not

4    have the ability to tell these directors of the Swiss

5    Foundation how to deploy the Foundation's assets.  The

6    Foundation is independent.  It is subject to regulation and

7    oversight by the Swiss authorities, but it is independent of

8    DLS.

9            **THE COURT:**  Okay.  Let's see.  The last speaker on the

10   defense side.

11           **MR. WANGER:**  Chris Wanger for Draper Associates.

12           **THE COURT:**  Very good.

13           **MR. WANGER:**  I represent one of the entities that is a

14   true believer in this technology.

15       And so Draper Associates acquired a minority interest in

16   DLS.  Draper Associates --

17           **THE COURT:**  True believer, but I believe Mr. Draper,

18   at least in some of the materials I saw, would indicate,

19   perhaps hope there would be some, you know, recovery out of

20   this process, that it wasn't an entirely a, you know, an

21   eleemosynary institution here.  He's a venture capitalist.

22           **MR. WANGER:**  I think everyone wants to see this

23   technology succeed.

24           **THE COURT:**  And want to benefit from it.

25           **MR. WANGER:**  And want to benefit from it.

1          So this technology offers great benefits to society.  It's

2     a secure platform.

3          And this plaintiff doesn't represent the community that

4     contributed to the development of this technology.  Draper

5     Associates' contribution to -- the crowd contribution dwarfs

6     his $5,000 contribution.  And so Draper Associates objects to

7     any restriction on what these funds can be used for.

8          They want to characterize this as imposing a status quo,

9     but that's not what they want.  They want to prevent any

10    transfer of these assets, which they acknowledge are in a very

11    volatile currency, Ethereum and Bitcoin.  And so Ethereum could

12    fall off a cliff tomorrow, the Foundation would be prevented

13    from trying to hedge and convert some of that into fiat

14    currency.  But they don't want to post a bond either, just a

15    nominal bond.

16         Draper Associates, again, just a shareholder in DLS, he

17    has -- Draper Associates has no role in the Foundation.  Draper

18    Associates has no position, no control.  The funny -- the money

19    is all with the Foundation, and the Foundation exclusively

20    controls how that -- how those funds are used.

21              **THE COURT:**  So do you also represent Mr. Draper?

22              **MR. WANGER:**  I do.

23              **THE COURT:**  Okay.  Anyone else?

24              **MR. WANGER:**  No, just those two defendants.

25         And, again, Mr. Draper is not an investor in DLS.  He's

1  just sort of one of the partners at Draper Associates.

2          **THE COURT:**  Okay.  And nobody is speaking for the

3  Breitmans in this?

4          **MR. WANGER:**  Their counsel is not here today.

5          **THE COURT:**  Okay.  All right.

6          **MR. WANGER:**  Thank you, Your Honor.

7          **THE COURT:**  Okay.  Thank you.

8      Go ahead, Mr. Fleming.

9          **MR. FLEMING:**  Thank you.

10      On an expedited hearing doesn't all make it into the

11  binder when you get on the plane.

12      So a couple of points that I would like to make.  I'll

13  start with a phrase that Mr. Potischman used, that we wouldn't

14  be coming in if this was a typical U.S. corporation, and I

15  think that's right.  But it's not xenophobia or parochialism;

16  it's the fact that this entity and this operation, the way it

17  was set up, isn't entitled to the same sort of presumption of

18  regularity that you would give to people who complied with

19  securities laws.

20      It's easy to look over there and see that you've got folks

21  from Davis, Polk and Cooley and Manatt, and these other very

22  sophisticated law firms, but that's not who set up this

23  process.  If you look at the exhibit, the white paper that

24  Tezos put out, this wasn't set up by sophisticated securities

25  professionals.  It was set up by a law firm in Switzerland, and

 1    I believe there was one U.S. firm, Barnes Legal, which was not

 2    one of the sort of traditional securities offering firms.

 3        And so there hasn't been, in the normal course, if this

 4    were -- if we were coming in and alleging that there had been

 5    some ticky-tack omission in a registration statement that the

 6    SEC had reviewed that had had -- you know, Wall Street banks

 7    had acted as the underwriters, that's a very different

 8    situation, and I think in that case there is a presumption of

 9    regularity that applies, and that would sort of caution the

10    Court against kind of interfering in the ongoing operations.

11        This is a different situation.  These are people who put

12    up a web site, you know, put up a web site, had people type in

13    two or three things into a form, and then they get a PDF

14    receipt that's their Tezos wallet.  And it's 2017, and we're

15    living in a crazy time.  And so they raised a lot of money.

16    But the amount of money and the fact that, you know, they now

17    have sophisticated counsel doesn't mean that it's entitled to

18    that sort of same presumption of regularity.

19        The second phrase, and it came from Mr. Gibbs, was that

20    there's work to do.  And the suggestion that this would somehow

21    bring everything to a screeching halt, there is money that

22    exists that we're not seeking that's not the subject of this

23    TRO.

24        So as we allege in the complaint, prior to the ICO, DLS

25    had raised money -- there was an initial raise of about

1   $900,000 from some high net worth individuals, a hedge fund.

2   There was also a $1.5 million investment by Draper or I guess

3   Draper Associates.  So there is money.

4        And the way -- what they represented to investors was that

5   DLS would work on developing the technology, and at the point

6   that DLS had developed the technology and it had been

7   operational for three months, at that point money would drop

8   down from the Foundation to DLS - 8.5 percent of the total ICO

9   proceeds.

10       So there is money that exists, and DLS are the ones who,

11   under their representations to the market, to the market, DLS

12   is the one that's supposed to be developing the technology, and

13   they do have money to do that.  That's not the target.  That's

14   not the target of this motion.

15       And then the last point I want to make is this idea

16   about -- and we do allege that that happens automatically on

17   the achievement of their goals.

18       And the last thing is this idea that we can't speak for

19   the Class, because of this petition.  And so there are a couple

20   things I would like to point out about the petition.  First of

21   all, if you read it -- and it's docket 24-8, I believe.

22            (Reading) So the following are ways in which the

23            Foundation has not met its obligation to advance the Tezos

24            project in support of a strong community:  Critical lack

25            of contribution, failure to fund supportive engagements

1          with developers, complete lack of management, and failure

2          to proceed with the project goals, failure of the

3          Foundation to engage in use of public relations firm,

4          allegations of impropriety by Mr. Gevers, Mr. Gevers'

5          failure to manage the Foundation as intended, in fact, his

6          misgovernance of the Foundation.

7          There are a lot of different points on this petition.  So

8     I don't think it's fair to read this petition as these are all

9     people who think that the people who have the money right now

10    are the ones who should be in charge of it and should be

11    entrusted.

12          **THE COURT:**  No, but their complaints -- if you can

13    summarize the complaints or characterize them, as you know, are

14    they singing a particular theme.  The theme is get moving and

15    start developing, which would involve, if you got the relief

16    that you're requesting, they couldn't do that.  They would be

17    counter to what they seem to want, which is put some of these

18    funds -- you know, put them to work and get us the project

19    developed.  If I granted your motion, everything would shut

20    down.

21          **MR. FLEMING:**  Well, again, not this motion, because

22    it's relatively limited relief, and DLS does have the other

23    funds.

24          I think also -- and I think a useful analogy is imagine

25    the scenario where there's a merger taking place, and a

1   plaintiff comes in -- and this is a more standard kind of

2   regular two U.S. public companies, there's a merger taking

3   place, and a plaintiffs comes in representing a putative class,

4   but not having filed a motion seeking to enjoin that merger

5   because there's a violation of the proxy for that statute,

6   section 14, maybe they have state law claims.  Courts routinely

7   will enjoin mergers where there is a violation of the

8   disclosure requirements of the U.S. securities laws.  And in

9   those cases, having done some of those, it is not the case that

10  every shareholder is standing up and cheering and saying, "Yes,

11  we want this merger to be enjoined."  But the courts hold, and

12  I think appropriately, that the disclosure principles of the

13  U.S. securities laws take precedents, and the right of whatever

14  subset of the class it is that says, you know what, no, this is

15  an unregistered offering, I'm entitled to a remedy, I want

16  my --

17          **THE COURT:**  Yeah, but that's a lot of it.  I've had

18  those cases, too, and they're a lot cleaner, because you

19  realize that if you don't give immediate relief, the merger

20  will close, and unscrambling the omlette is pretty hard to do,

21  and so that plays into that.

22      We don't have any imminent thing, other than --

23          **MR. FLEMING:**  That's all -- I'm sorry.  And I don't

24  mean to suggest that that's analogous on the imminent harm

25  prong.  I just think that it goes to suggest that you can have

1    a scenario where a significant number of class members maybe

2    don't want the relief, but nonetheless where there's an

3    entitlement to it.  So I think those are separate questions.

4        And the last thing I would say -- and I don't think I

5    explained it well when I stood up the first time, so I'd like

6    to do it again -- is the importance of the statements made by

7    Mr. Schmitz Krummacher.

8        If you read -- and it's paragraph three of my supplemental

9    declaration quotes it:

10           (Reading) "I can understand, that it seems to be very

11        strange, that the Foundation has so much money and is not

12        paying the developers.  Very strange!

13           "The truth is budget was for sure released to pay the

14        developers for many months, and increase the number as

15        well.  But then the media about Tezos came in and made

16        banks and authorities nervous.

17           "Really nearly over night the policy changed and

18        stopped nearly everything.  Most of the banks in

19        Switzerland are not paying out any more Fiat that

20        originated -- I'm cleaning up the English -- that

21        originated in an ICO, or Crypto - or only after a very

22        deep check, and only to really external/third partners."

23        And then it goes on to say:

24           "So according to Tezos Media, a couple of foundations

25        are searching for new banks."

1    So that's relevant for two reasons.  Number one, it shows

2    the fact that money hasn't gone out the door, isn't necessarily

3    attributable to Mr. Gevers' good faith or their, you know,

4    strong allegiance to their fiduciary duties.  It's maybe that

5    the banks are stopping them from doing it.

6    The point that the defendants' own banks don't trust them

7    with that money, I think that strongly suggests that there

8    is -- there is some risk of imminent harm.

9    Second, there's the statement that they're going and

10   looking for other banks.  So at the point that that happens, if

11   they are able to transfer to more client banks, whether it's in

12   the Alderney Islands, the Caymans, Bermuda, it may be the case

13   that the bureaucratic hurdles in Switzerland that have slowed

14   down the flow of money now may disappear, at which case we may

15   be living in another world, which just goes back to sort of my

16   original point about these are not people who are entitled to a

17   presumption of regularity.

18   And I think it would be appropriate for the Court to enter

19   a tangent order freezing the status quo, allowing us -- we

20   could get a motion on file very quickly seeking expedited

21   discovery -- and allow us to sort of figure out what's going

22   on, so that the Court can make a decision on a preliminary

23   injunction on a more fulsome record.

24   But I think what we have here today does show -- does show

25   a real risk of imminent harm and does satisfy the criteria set

1    out in *Winter*.

2        If the Court has other questions, I'm happy to answer

3    them.

4        **THE COURT:**   Okay.   Matter is submitted by everybody?

5        Okay.   I will give you a written order.

6        But I will tell you that I'm going to deny the request for

7    a temporary restraining order, and I'm doing it on the

8    irreparable injury prong, which I don't think there has been a

9    sufficient showing for this extraordinary relief that's been

10   requested.

11       I don't even -- I don't think I need to get into the

12   substantial likelihood of success on the merits question, which

13   we will flesh out at the preliminary injunction hearing.

14       I do encourage the parties -- I know there was a

15   suggestion here that maybe a request for more time to have the

16   briefing completed, and I encourage the parties -- and I know

17   there are lots of them now -- to work together so that there is

18   some sort of logical flow to what's being submitted to me, and

19   to work together just generally to get this whole thing

20   organized.

21       And so I also will tell you that it will be not surprising

22   to you I want to consolidate all of this, so I'm not going to

23   have a preliminary injunction hearing for Mr. MacDonald and a

24   preliminary injunction hearing on its related cases.   It's all

25   going to be put together in some form of another.

1       So I think it behooves all of you to work together and to

2   give me a proposed plan of some kind as to how you want this to

3   be litigated.  But we will go from there.  And as I say, it's

4   not going to be long, but I'll give you a short written order

5   so the record is clear if you, you know, wish to seek some

6   further review from the powers on high.

7       So thank you very much.

8       Interesting beginning to this process.  And happy

9   holidays.

10          **ALL COUNSEL:**  Thank you, Your Honor.

11              (Proceedings adjourned at 11:15 a.m.)

12                      ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, December 26, 2017

8

9

10

11   _____

12            Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                        Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25